Rule 23 order filed
September 19, 2019.
Motion to publish granted
October 4, 2019.

2019 IL App (5th) 180260

NO. 5-18-0260

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 15-CF-1165 |
| | ) | |
| RONNIE BLOM, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court, with opinion.
Justices Moore and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1    This is a direct appeal from the circuit court of Madison County. The defendant was convicted of two counts of criminal sexual assault and sentenced to eight years on each count, to be served consecutively and to be followed by a period of mandatory supervised release between three years and life. The defendant raises three issues on appeal: (1) that he was denied due process of law where the State failed to prove beyond a reasonable doubt the offense element of force on the first count, (2) that he was denied due process of law where the trial court erred in allowing the testimony of three other-acts witnesses to be presented at trial, and (3) that he was denied due process of law where the State's misstatement of the law in closing argument constituted plain error. For the reasons that follow, we affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3     On May 20, 2015, the defendant, Ronnie Blom, was charged by information with two counts of criminal sexual assault for two acts of digital penetration during a massage he performed in the course of his employment at MassageLuXe in Edwardsville.

¶ 4     On June 13, 2016, the State filed a motion *in limine* to admit the defendant's sexual acts or conduct toward women other than the charged victim (other-acts witnesses). In opposition to the State's motion, the defendant argued that "the degree of factual similarity to the charged offense and the uncharged alleged sexual conduct he engaged in with the other women is so dissimilar that evidence of the uncharged offenses is not admissible under 725 ILCS 5/115[-]7.3." The defendant argued that because none of the other-acts witnesses alleged that he penetrated their sex organ (his charge in this case), the prejudicial effect of the testimony would outweigh its probative value.

¶ 5     On September 6, 2016, the trial court issued a written order granting the State's motion. In its order, the court found that all of the incidents occurred during massages, in the course of the defendant's employment; all of the victims were female; all of the touchings constituted, at a minimum, the offense of battery; and all of the incidents occurred between 2012 and 2015. Therefore, the court concluded that "given the proximity in time to the charged offense, the factual similarity to the charged offense, and all other relevant factors, that the probative value of the testimony of each of the five women set forth in the State's motion outweighs any possible undue prejudice which may result against the defendant."

¶ 6     After the trial court entered its finding on the State's motion, the defendant filed a motion *in limine* arguing that, though the court previously granted the State's motion to call other-acts witnesses, if the witnesses were called to testify, the probative value of that testimony would be

2

substantially outweighed by the prejudice to the defendant. Following a hearing on September 28, 2017, the court denied the defendant's motion.

¶ 7    On October 10, 2017, the trial court conducted *voir dire*. During the initial stages of the *voir dire* process, the court admonished the potential jurors that "[a]t the conclusion of the case, the attorneys will be able to make closing arguments. Again, closing arguments are not evidence and should not be considered by you as evidence. It's simply the attorney's opportunity to argue to you what they believe the evidence has shown and what they believe your verdict should be." The attorneys were then allowed to question the potential juror pool, and a panel was chosen.

¶ 8    On October 11, 2017, the trial commenced. Detective Michael Lybarger testified for the State that on April 30, 2015, the victim, D.M., walked into the Edwardsville Police Department to lodge a complaint of sexual assault. Detective Derrick Fitzgerald, who was the on-call detective for the Edwardsville police that night, was called in to work with Lybarger on the investigation into D.M.'s accusations against the defendant. Initially, she identified "Ronnie" (she did not know his last name at the time), a massage therapist at MassageLuXe, as her attacker. Eventually, as a result of the investigation, the defendant was charged and a press release was issued and posted on the police department's Facebook page. The post was then publicized in the media. The publication resulted in more female individuals coming forward and being interviewed by the Edwardsville police in connection with the defendant's charges and D.M.'s accusations.

¶ 9    D.M. testified that in about 2010, she began seeing a chiropractor for pain she was experiencing in her sacroiliac joint (lower back). As part of her treatment, her chiropractor introduced her to a massage therapist whom she used initially for massage therapy. Typically, when she would receive a massage, prior to the appointment, the massage therapist would

3

question her as to where she was experiencing pain, where the therapist should focus the massage, and the nature of the problem. After a brief conversation, the massage therapist would leave the room so she could undress and then return to the room and perform the massage. Due to the location of her injury (the very lowest part of her spine), when she went in for a massage she would fully undress and then lie on the massage table under a sheet until the therapist reentered the room.

¶ 10    In December 2014, she began going to MassageLuXe in Edwardsville for her massages. Her husband had previously gone to this location for his own massages and was so satisfied with the service and the facility that he purchased a gift membership for her. Typically, when she arrived at MassageLuXe, she would check in at the front desk and then be escorted to a waiting room. The massage therapist would then retrieve her from the waiting room and escort her to the private room where the massage would be administered. Typically, the room contained a massage table covered with a blanket and a folded sheet. The rooms were not very large. At some point she informed MassageLuXe of the injury in her lower back. On the electronic intake questionnaire that she completed, she did not identify any areas that she did not want to be touched; however, in her experience, it was not typical for the massage therapist to massage her breasts or her genital area, and she did not think that it needed to be addressed. Initially, due to her inconsistent schedule, D.M. did not always see the same massage therapist but would instead call MassageLuXe, tell them the day and time she was able to come in, and they would book her with one of the massage therapists available at that time.

¶ 11    At some point in late 2014, D.M. called to schedule an appointment and was asked whether she was comfortable with a male massaging her, to which she responded that she was, and was told that the defendant had availability. Her first massage with the defendant was in late

4

2014. The first massage she received from the defendant was typical and did not give her a reason to be concerned. Due to his satisfactory performance during the first massage, D.M. began requesting the defendant as her massage therapist when she would make her appointments. In early 2015, she received four to five massages from the defendant. She had no other relationship with the defendant outside of MassageLuXe. She did not typically engage in conversation with the defendant during her massages, as it would interfere with her ability to relax.

¶ 12    On April 30, 2015, she scheduled a 90-minute massage at 2:30 p.m. with the defendant. On that day, she checked in as normal with the front desk and then sat in the waiting room. She waited for over 30 minutes in the waiting room before asking the front desk if there had been a misunderstanding in scheduling. After an additional 10 minutes, the defendant came out into the waiting room to retrieve D.M. for her massage. The defendant apologized for her wait and told her that "he had thought the client prior to [her] had been scheduled for 90 minutes and so he went over." She said that the defendant seemed "flustered and rushed." The defendant instructed her to undress and lie face up on the table. He then left the room. She removed all of her clothes and lay face up on the table under the table draping; she was covered by the draping up to her neck. There were no windows in the room, and she could not hear any of the activity occurring outside of the room—she could only hear the music playing from the speakers inside of the room. There was never anyone in the room with her other than the defendant.

¶ 13    After approximately three to four minutes, the defendant entered the room and, prior to starting the massage, he placed hand towels over her pubic area and over her breasts and then draped the sheet over the towels. He then uncovered her left leg from under the drape and began massaging her right quadricep and right knee. She noted that it was not typical for the massage to

5

start on her legs. Though it was unusual, she was not uncomfortable at this point in the massage. The defendant then began massaging her left quadriceps but did not move around to the other side of the table. While massaging her left leg, he was reaching across her entire body. She then felt "something grazing [her] pubic area that was kind of unusual. [She] never felt anything like that in a massage before." She felt something brush her vaginal area three times. This had never occurred during any previous massage, she felt uncomfortable, and she felt like it crossed the line between therapeutic and sexual touch. She did not say anything to the defendant because she was unclear as to what his intentions were, his actions seemed ambiguous, and she did not want to escalate the situation and put herself in danger. The defendant then moved on and began massaging other parts of her body. After some time, the defendant removed the entire drape from her body, including the towels, leaving her lying completely naked, face up, on the massage table with her eyes closed. This had never happened during any of her previous massages. Lying there completely naked on the table made her feel scared, unsafe, and unsure of the defendant's intentions and the range of possible actions he was willing to take since he had already removed all of her coverings. She then "froze" and kept her eyes closed. She did not say anything to the defendant or tell him that she was uncomfortable, because she was "a woman in a room alone with a man who appears to have bad intentions" and she did not know if saying anything would help her in this situation. She did not think anyone would be able to hear her if she yelled out. She did not get up from the table, as she "was kind of in shock" and did not really feel like she could move. She then felt the defendant's fingers inside her vagina. The defendant's fingers were inside her vagina for 20 to 30 seconds. She felt unsafe and scared.[1]

_____

[1]There was additional testimony by D.M. as to the rest of the massage and the second assault; however, since the defendant has conceded that the State proved beyond a reasonable doubt the second count of criminal sexual assault, this court will only include facts relevant to the first count.

¶ 14     S.B. testified that she gets regular massages at least every three to four weeks. In 2015, she would typically receive these massages at MassageLuXe in Edwardsville. When she would arrive at the facility, she would check in and then be taken to a waiting area where she would wait for her therapist to come and get her for the massage and take her to the massage room. She said it was typical to have a short conversation with the massage therapist regarding any conditions they should be aware of and what the client would like to have massaged. The therapist would then tell her to undress to her comfort level and leave the room.

¶ 15     On January 12, 2015, she received a massage from the defendant. She had never previously received a massage from the defendant but was immediately uncomfortable with him because she thought "[t]here was something unsettling about him." However, she still went in for the massage, as she had never met the defendant before and did not want to be rude. The defendant escorted her into the private room, discussed her back problems with her, told her to undress to her comfort level, and left the room. She removed all of her clothing except her underwear. Although she typically removed her underwear for her massages, she did not do so at this appointment because she was uncomfortable and wanted a "barrier" between herself and the defendant. She then lay on the table face down under a blanket, and the defendant returned to the room and began the massage. She first felt uncomfortable when the defendant began massaging the area where her thigh met her buttocks. At that point during the massage, the defendant started reaching around to the inside of her thigh. He grabbed her aggressively in this area and reached under the elastic band of her underwear several times. She could feel the defendant's fingers under her underwear, and she felt him touch her labia. At this point, her mind began racing and she was uncomfortable. She then told the defendant that what he was doing was uncomfortable and asked him to move on. The defendant moved to the next leg and repeated the same sequence

7

of events, massaging under her underwear and touching her labia. She again told the defendant she was uncomfortable and asked him to move on. The defendant moved away from the area and continued with the rest of the massage. She had never been touched in this manner in any previous massage. After the massage ended, the defendant left the room; she dressed herself and walked outside to the lobby where she normally paid. The defendant was in the lobby laughing and joking with another massage therapist and the person working the desk. She signed for her massage, left the building, got in her car, and called her husband. She initially did not report the incident to the police, but after seeing an article about the defendant on Facebook, she decided to report him.

¶ 16    K.B. testified that she did not receive regular massages, but she would occasionally go for relaxation, stress relief, and muscle pain. Generally after receiving a massage, she would feel relaxed and "sleepy." At some point in 2012, she made an appointment for a massage with the defendant at Massage Envy in Glen Carbon. When she arrived on the day of her massage, she checked in and filled out a form indicating that she did not want to be touched on her buttocks or main torso area (front)—she only wanted her back, arms, and legs massaged. She was greeted by the defendant. She was surprised that he was a man because she had assumed that "Ronnie" was female. This made her uncomfortable because she normally only received massages from female therapists. Upon meeting the defendant, she thought he looked unkempt and unhealthy but went ahead with the massage as she did not want to be rude to the establishment or the defendant. She then entered the massage room with the defendant, at which point he tried to persuade her to allow him to massage her buttocks. She told him no, and he left the room to allow her to undress. She removed all of her clothing except her underwear and lay face up on the table under the sheet. Fairly soon after the massage began, the defendant asked her to turn over and lie face

8

down on the table. She obliged, and the defendant massaged her arms and lower legs for a short period until he began to move up her leg toward her buttocks. At this point she could feel his erect penis running up and down her leg. He was standing very close to her and began massaging her inner thigh and then moved to where her panty line was in her groin area near her buttocks. This made her feel shocked, and she was afraid to move.

¶ 17    When the defendant was massaging her buttocks, she reminded him that she did not want that area massaged, and he again attempted to persuade her to allow him to massage the area and continued to massage the area despite her objection. She did not mention the defendant's erection, as she was afraid he would rape her if she moved or said anything to upset him. The defendant had the erection throughout the course of her massage. She was too afraid to say anything to the defendant because she was "locked in a dark room with a man [she didn't] know who [was] trying to do something completely wrong and [she] thought if [she] moved or said any more that he would rape [her]." Nothing like this incident had ever happened during any of her previous massages. The defendant left the room without speaking. She then got dressed and left. She did not report the incident to a manager or the police because she was embarrassed, afraid, ashamed, and began second-guessing herself. She did not report the incident until 2015 after reading a news article about the defendant asking anyone who had an encounter with him to call the police department because he was accused of a crime.

¶ 18    On October 12, 2017, J.W. testified that on average she received massages upwards of six times per year. On April 22, 2015, she went to MassageLuXe for a prenatal massage which was scheduled with the defendant. At the time, she was pregnant with her daughter in her third trimester. She checked in at the front desk and went to wait in the waiting room for him. He then greeted her, and they went to the massage room. He asked if she was experiencing any problems,

9

and she told him that her feet and back hurt because she had been moving. He asked if she had trouble with urination, which she found odd because she had never been asked that question before, including before other prenatal massages. He then told her to undress to her comfort level. She undressed herself, leaving on her underwear, and lay on the table, with a sheet pulled over her body up to her armpits. The massage table was set at an incline. The defendant returned to the room and began the massage. She started to feel uncomfortable when he began massaging inside her armpits near her breasts.

¶ 19    At this point during the massage he had also removed the sheet that she previously had draped over herself and replaced it with a hand towel that only covered the majority of her breasts. He pulled her arm out and was massaging her armpit and touching her breast tissue. This made her feel violated. She did not tell him that she felt uncomfortable because she thought he was a professional, and she also felt vulnerable as she was alone and pregnant. During the course of the massage, the towel over her breasts "slipped a couple of times," and she would then feel his hand brush against her nipple. This made her feel very uncomfortable, and she made a noise indicating these feelings, which caused him to apologize. He also massaged her mammary glands in her breasts and massaged her pregnant belly, both of which made her feel violated. She did not tell him that he was making her uncomfortable because she was scared as she was alone and pregnant. After he massaged her pregnant belly, he placed one hand between her breasts on her sternum and the other in her groin area between her groin and her thigh—close to her pubic area—for stretching purposes.

¶ 20    Throughout the massage, the defendant spoke to her and gave her explanations of his massage method, but she still felt uncomfortable. He then draped her leg over the side of the table and began massaging her leg, including her inner thigh. As he did this, her pubic area was

10

partially exposed, as the draping was not covering her fully. As he was massaging her inner thigh, she became alarmed. At this point in the massage, she believed he would take further action against her, so she did not say anything or leave the table. His actions during the massage made her feel violated. This massage was not like any other massage she had previously received. The defendant told her the massage was over and that she should get dressed and come out when ready. She quickly dressed herself and left the room, where the defendant was waiting for her. He escorted her to the waiting room. She then went to the lobby to check out. She left the premises without speaking to a manager or lodging a complaint. A few weeks later she went back to MassageLuXe for a prenatal massage but requested to be treated by a female massage therapist. When she called to book the massage, the woman who was booking the appointment asked her if she wanted to see the defendant again, to which she replied "absolutely not." She went to her next appointment and afterwards she complained to both the massage therapist and the receptionist at the front desk about her previous experience with the defendant. Within a month of the incident, she reported him to the police because she saw a report on Facebook that another woman had made a complaint against him. On cross-examination, she admitted that she did not know if any of the other prenatal massages she received were administered by therapists certified in prenatal massage, which the defendant was.

¶ 21    Derrick Fitzgerald, a detective with the investigations division of the Edwardsville Police Department, testified that he was the on-call detective on the night of April 30, 2015. On that night, he was contacted by an officer at the police station and told that he needed to come in to handle a case of sexual assault. He arrived at the Edwardsville police station at approximately 8:20 p.m. When he arrived, the victim, D.M., was already at the police station. He conducted a video-recorded interview with her. During the interview, she supplied the defendant's first name

11

and gave a physical description of him. Using social media, he was able to identify the defendant. He then verified with MassageLuXe that the defendant was in fact employed there. He continued his investigation and at some point charges were filed against the defendant. After the charges were filed, the police department released a press release that included a description of the incident, charging information, and the suspect's information including a photograph. After the press release was released to the public, he began to receive calls from other women offering information about the defendant. As part of the investigation, he spoke with K.B., S.B., and J.W. about their interaction with the defendant, which corroborated D.M.'s accusations.

¶ 22    After the close of the State's case, the defense moved for directed verdict, arguing that the State failed to prove the element of force beyond a reasonable doubt. The motion was denied, and the defense rested. The State then gave its closing argument. In relevant part, the State argued:

> "Vulnerable, violated, victimized. ***
> That was how [D.M.] felt when the Defendant sexually assaulted her, when the Defendant through an act of force, an act of sexual penetration forced his fingers inside the sex organ of [D.M.], not once but twice. ***
>                                  * * *
> *** Her feelings were real, and when the Defendant forced an act upon her there is no doubt in her mind that was a forceful situation. It was a scary situation that she just wanted to get out of, like so many women had to experience before.
> ***
> First off, a person commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim by force or threat of force.
> And the issues in criminal sexual assault are: First proposition, that the Defendant knowingly committed an act of sexual penetration upon [D.M.]. And the second proposition is, that the act was committed by force or threat of force.
>                                  * * *
> *** The term 'force' or 'threat of force' means the use of force or violence or the threat of force or violence.
> That is the definition of force I anticipate that you will receive, no more, no less. An unexpected, unwanted, unrequested act. An act of sexual penetration is in its nature an act of force. Sexual penetration does not occur by accident. It is an act, a conscious act that occurs with force.
>                                  * * *

12

*** He forced his fingers inside [D.M.], not once, but twice. *** An act of sexual penetration is an act of force and an act of violence.

* * *

An act of sexual penetration in and of itself is an act of force. ***

***

It is not about how [D.M.] reacted. It is about what the Defendant did, and the Defendant committed an act of sexual penetration, an act of force or violence, and that's criminal sexual assault."

After closing arguments, the trial court instructed the jury, in pertinent part, as follows:

"Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

* * *

Evidence has been received that the Defendant has been involved in an offense other than those charged in the Information. This evidence has been received on the issues of the Defendant's intent, motive and knowledge and may be considered by you only for that limited purpose.

* * *

To sustain the charge of Criminal Sexual Assault the State must prove the following propositions: First proposition, that the Defendant committed an act of sexual penetration upon [D.M.]. And second proposition, that the act was committed by the use of force or threat of force.

*** The term 'force' or 'threat of force' means the use of force or violence or the threat of force or violence."

¶ 23    On October 12, 2017, the jury returned guilty verdicts on each of the counts of criminal sexual assault. The trial court then entered judgment on the jury's verdict.

¶ 24    On November 6, 2017, the defendant filed a motion for new trial arguing that the State failed to prove him guilty beyond a reasonable doubt; that the State failed to prove the use or threat of force beyond a reasonable doubt; that the court erred in denying his motion for a directed verdict; that the court erred in denying his motion for judgment notwithstanding the verdict; that the court erred in allowing the testimony of other-acts witnesses where the conduct the State introduced into evidence was so dissimilar to the charged conduct that the admission of the evidence was highly prejudicial and prevented him from receiving a fair trial; that the court erred in denying his motion *in limine* to prohibit the State from eliciting testimony or statements

13

about uncharged conduct and that this evidence was highly prejudicial and prevented him from receiving a fair trial; that the State made prejudicial and erroneous statements in closing argument, including misstatements of the law, thereby prejudicing his right to a fair trial; and that he was denied a fair trial because the jury's foreperson interacted with members of law enforcement outside of the courtroom, during recesses in trial.

¶ 25    On January 23, 2018, the defendant was sentenced to eight years on each count to be served consecutively and to be followed by a term of mandatory supervised release between three years and life. The defendant must serve 85% of said sentence.

¶ 26    On February 21, 2018, the defendant filed a motion to reconsider sentence, arguing that the 16-year sentence imposed by the trial court was excessive in light of the applicable factors in mitigation weighed against the factors in aggravation and that the court should have instead imposed the minimum sentence of 8 years' imprisonment. On April 19, 2018, the court denied the defendant's motion. On May 1, 2018, the defendant filed a notice of appeal.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, the defendant makes three contentions. First, the defendant argues that the State did not prove beyond a reasonable doubt that his first penetration of the victim was done with force.[2] Second, he contends that he was denied due process where the trial court allowed three other-acts witnesses to testify because two of the witnesses' encounters with the defendant were so dissimilar that the prejudicial effect outweighed the probative value of their testimony and that the cumulative effect of the other-acts evidence was such that he was denied his right to a fair trial. Third, he argues he was denied due process where the prosecution misstated the law on use or threat of force in closing argument to the jury. For the reasons that follow, we affirm.

---

[2]He concedes that the State proved the second penetration was done with force.

14

¶ 29                    A. Beyond a Reasonable Doubt

¶ 30    If the State fails to prove a defendant guilty beyond a reasonable doubt, the conviction must be overturned. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On review, a jury's finding of fact will not be disturbed on appeal if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court will not reweigh the evidence or make any credibility determinations regarding witnesses. *People v. Thomas*, 178 Ill. 2d 215, 232 (1997).

¶ 31    The Criminal Code of 2012 (720 ILCS 5/11-1.20 (West 2014)) establishes two elements for the offense of criminal sexual assault. First, defendant must commit an act of sexual penetration. *Id*. § 11-1.20(a). Second, defendant must use force or threaten the use of force. *Id*. § 11-1.20(a)(1). Force or threat of force is defined as "the use of force or violence or the threat of force or violence ***." *Id*. § 11-0.1. Force does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, which causes the victim to submit to the penetration against their will. *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007). The amount of force used by a defendant depends upon the facts and circumstances of each case. *People v. Taylor*, 48 Ill. 2d 91, 98 (1971). Generally speaking, force implies the exertion of power in order to make a victim comply against her will. See *People v. Vasquez*, 233 Ill. App. 3d 517, 523-24 (1992). "There is no requirement that a victim of sexual assault attempt to escape or to cry out where she is restrained by fear or where to do so would endanger her life." *People v. Gramc*, 181 App. 3d 729, 735 (1989). By the use of force, the acts that follow are necessarily nonconsensual. *Denbo*, 372 Ill. App. 3d at 1005-06.

15

¶ 32    Here, the defendant argues that the State failed to prove beyond a reasonable doubt that he used force in the commission of the first act of digital penetration. We disagree. Prior to the first digital penetration, he was alone with the victim in a dark locked room. He instructed the victim to lie on the table, which she initially thought was for the purpose of the massage. His intentions became more apparent to her when he completely removed the sheet covering her body and began touching her in unusual and inappropriate ways. At this point, she testified that she felt scared, unsafe, and did not get up from the table because she "froze." The defendant, then having the victim naked on her back in a vulnerable position, and frozen in fear, digitally penetrated her. After the first penetration, he repeated the sequence of events and digitally penetrated her a second time. A rational trier of fact could find that a woman locked in a dark room, alone, naked, with a man, where she thought no one could hear her yell, while he digitally penetrated her without her consent, constituted a threat of force beyond a reasonable doubt.

¶ 33                              B. Other-Acts Witnesses

¶ 34    The defendant next argues that the trial court abused its discretion where it allowed three other-acts witnesses to testify because the prejudicial value of the women's testimony outweighed the probative value of the evidence.

¶ 35    A court is not required to exclude relevant, admissible evidence merely because it tends to prejudice a defendant. *People v. Daniels*, 164 Ill. App. 3d 1055, 1078 (1987) (citing *People v. Wright*, 140 Ill. App. 3d 576 (1986)). Instead, the court is under a duty to avoid the introduction of evidence where the prejudicial effect outweighs its relevance. *Id*. (citing *People v. Jones*, 94 Ill. 2d 275 (1982)). In weighing the probative value of evidence against its undue prejudice, a court may consider: "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and

16

circumstances." 725 ILCS 5/115-7.3(c) (West 2014). A court's evidentiary determination will not be overturned absent an abuse of discretion. *Daniels*, 164 Ill. App. 3d at 1078 (citing *People v. Lester*, 145 Ill. App. 3d 720, 735 (1986)). An abuse of discretion will be found only where the trial court's decision is either "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 63.

¶ 36    Here, there were eight total witnesses called, three of whom were other-acts witnesses. The defendant argues that two of the other-acts witnesses were overly prejudicial and denied him his constitutional right to a fair trial because his contact with K.B. and J.W. was too dissimilar to his contact with the victim in this case and a large portion of the evidence at trial was other-acts witnesses.

¶ 37    We disagree with the defendant's contention that he was denied due process where the trial court allowed other-acts witnesses K.B. and J.W. to testify. As the court previously noted: all three witnesses were female massage clients that made appointments with the defendant; all three experienced inappropriate touching by the defendant during a massage; all of the incidents occurred between 2012 to 2015; and all of the touching constituted, at a minimum, the offense of battery. Though we agree with the defendant that some of the testimony was prejudicial (*e.g.*, J.W.'s testimony regarding the defendant touching her pregnant belly), we cannot say that it was so overly prejudicial that its probative effect was outweighed by the prejudice or that the ruling of the trial court allowing K.B. and J.W. to testify was an abuse of discretion.

¶ 38    As for the cumulative effect of the other-acts evidence, that is a decision that lies within the sound discretion of the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Evidentiary rulings will not be reversed absent an abuse of discretion. *Id*. The defendant has failed to make a

17

persuasive argument as to how the trial court abused its discretion in allowing three other-acts witnesses to testify. The judge specifically instructed the jury prior to any of the witnesses taking the stand that:

> "[e]vidence will be received that the defendant has been involved in an offense other than those charged in the Information. This evidence will be received on the issues of the Defendant's intent, motive, and knowledge, and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that offense, and if so, what weight should be given to this evidence on the issues of the defendant's intent of motive and knowledge."

The court again gave this instruction at the close of the evidence before the case was given to the jury. The trial court therefore limited and substantially reduced any potentially prejudicial or cumulative effect the evidence had on the defendant's trial and did not abuse its discretion in allowing the witnesses to testify.

¶ 39                    C. Definition of Force in Closing Argument

¶ 40    The third and final issue raised by the defendant on appeal is that the State's misstatement of law in closing argument was plain error that denied him due process. He concedes that this issue was not preserved for appeal and therefore is only reviewable for plain error. Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." There are two types of plain error. The first arises "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.]" *People v. Herron*, 215 Ill. 2d 167, 178 (2005). The second arises "where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.]" *Id*. at 179.

18

¶ 41    Here, the defendant is arguing the first type of plain error occurred in this case. He is correct that the State misstated the definition of force twice during closing argument by arguing that "[a]n act of sexual penetration is in its nature an act of force." However, we note that the State initially used the correct definition of force or threat of force in stating that "[t]he term 'force' or 'threat of force' means the use of force or violence or the threat of force or violence." More importantly, the trial court properly instructed the jury on the correct definition of force or threat of force as "the use of force or violence or the threat of force or violence"; the court also instructed the jury that the attorneys' opening statements and closing arguments were not evidence and any statements not based on the evidence should be disregarded. The court also advised the jury that the law that applied to this case was stated in the instructions. Therefore, because the trial court properly instructed the jury on the correct definition of force or threat of force, we cannot say that the State's improper statements during closing argument were so serious that they affected the fairness of the defendant's trial. Therefore, we hold that the State's comments regarding force and threat of force, although erroneous, do not amount to plain error.

¶ 42                                    III. CONCLUSION

¶ 43    Therefore, we affirm the defendant's conviction for both counts of criminal sexual assault.


¶ 44    Affirmed.

19

2019 IL App (5th) 180260

NO. 5-18-0260

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 15-CF-1165 |
| | ) | |
| RONNIE BLOM, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Rule 23 Order Filed:** September 19, 2019
**Motion to Publish Granted:** October 4, 2019
**Opinion Filed:** October 4, 2019

**Justices:**     Honorable Thomas M. Welch, J.

          Honorable James R. Moore, J., and
          Honorable John B. Barberis, J.
          Concur

**Attorney for Appellant**     Curtis L. Blood, P.O. Box 486, Collinsville, IL 62234-0486

**Attorneys for Appellee**     Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse, 157 North Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino, Director, Patrick D. Daly, Deputy Director, Max C. Miller, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864