2024 IL App (1st) 220147-U

No. 1-22-0147

Order filed February 29, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 3813 |
| | ) | |
| SAHIR ARBO, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for aggravated kidnapping and aggravated criminal sexual assault over his challenge to the sufficiency of the evidence.

¶ 2    Following a bench trial, defendant Sahir Arbo was convicted of aggravated kidnapping and three counts of aggravated criminal sexual assault. The circuit court imposed an aggregate sentence of 27 years' imprisonment. On appeal, defendant argues that the State failed to prove his guilt beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3    Defendant was charged with 2 counts of aggravated kidnapping and 16 counts of aggravated criminal sexual assault. Before trial, the State nol-prossed four aggravated criminal sexual assault counts.

¶ 4    At trial, K.T. testified that, on January 29, 2016, she was a college student and lived in a dorm in Chicago. That night, she and her friend Olivia Day drank wine in Day's dorm room and then went to a bar called Berlin. They drank alcoholic beverages and danced. Then they walked to another bar, Big City Tap, for cheaper drinks. There, K.T. observed a man in a red sweater staring at her while Day ordered alcoholic drinks. The man made her uncomfortable. K.T. and Day drank the drinks and returned to Berlin. There, they drank some more alcoholic drinks but were "mostly" dancing. K.T. was intoxicated and her limbs felt loose and wobbly. She consumed at least seven drinks that night, and usually felt the effects of alcohol after about two drinks.

¶ 5    As Berlin neared closing time, Day went outside to smoke a cigarette. K.T. was dancing on an elevated platform. She noticed the man in the red sweater standing next to the platform. He spoke to K.T. but she could not hear him. She leaned towards him and he "grabbed" her arm, "pulled" her off the platform, and wrapped his other arm around her back. He led her outside and to a vehicle that was parked right in front of the bar. He "kind of pushed" or "slid" her into the backseat and entered next to her. It did not "take much" to do so as she was unsteady and "like a rag doll." There were two other men in the vehicle's front seats. The man in the red sweater put his arm around K.T. and told her, "You're okay, it's okay." K.T. texted Day that she thought she was going to be raped.

¶ 6    The men drove to a motel.[1] The man in the red sweater "slid" K.T. out of the vehicle and wrapped his arm around her, and all four occupants entered the motel office. The man who had driven the vehicle spoke to the attendant. The attendant looked at K.T. K.T. and the men then entered one of the motel's rooms. The man in the red sweater guided her into it with his arm around her. The men spoke briefly in a different language. K.T. texted Day and her roommate, Michelle Yu, for help. She also texted Yu that she thought the men would rape her. The men stopped speaking and the two who had been in the vehicle's front seats left the motel room.

¶ 7    The man in the red sweater told K.T. to undress. She declined and he said it again. She declined again and he approached, took her bag with her phone, and turned her phone off. He tossed her bag on a table next to the bed. He got on top of K.T. and removed her clothes. He removed his clothes, pushed her head down as she lay on her stomach, lay on top of her, and penetrated her vagina with his penis. She told him to stop and he told her to say it was okay. She tried to turn and grab his hair or face. He pushed her harder into the bed so she could barely breathe and repeatedly told her to say it was okay.

¶ 8    One of the man's hands gripped the back of K.T.'s neck and the other was on her arm, "keeping [her] down." He then penetrated her anus with his penis. The vaginal and anal penetration was "incredibly painful." He flipped her over, stood next to the bed with his hands on her neck, and forced his penis in her mouth. He thrusted and she screamed. He penetrated her vagina again. K.T. "blacked out," like she "was just a body" while things happened to her.

---

[1] At trial, the parties and witnesses inconsistently referred to the location as a motel and a hotel. For consistency, we will use motel throughout this order as K.T. and defendant testified the room in which the events occurred was entered from the outside and, on appeal, neither party argues that the distinction is relevant.

¶ 9     The next thing K.T. remembered was a banging on the door. The man who had assaulted her exited the bathroom and the other two men entered the motel room, yelling in a foreign language. K.T. turned on her phone and started receiving messages from Day and Yu. She texted Yu to call the police. The men who had just entered left again. The man who had assaulted her told her to dress.

¶ 10    Yu called K.T. and K.T. answered. The man said to tell Yu she was okay and K.T. complied. Yu said K.T. was not making sense and asked to be put on the phone with someone else. K.T. gave her phone to the man, who spoke with Yu. K.T. did not remember what he said. The man then guided her out of the room and into the same vehicle. Yu gave the men her and K.T.'s address and they drove there. The man who had assaulted K.T. repeatedly told her to say she was okay and she complied. She spoke with Yu "on and off" during the drive. She texted Day that she was coming home and thought she had been raped.

¶ 11    When they arrived at K.T.'s dorm, Day awaited in the lobby. K.T. told her she had been raped. She also told a security guard. The security guard took her into an office and she told him what happened. An ambulance arrived and transported her to a hospital. She told the paramedics and hospital staff what happened. Hospital staff performed a sexual assault evidence collection kit and collected K.T.'s urine.

¶ 12    The State introduced screenshots of K.T.'s text messages with Day and Yu. They are included in the record on appeal and have been reviewed by this court. They reflect that, at 3:46 a.m. on January 30, 2016, Day texted K.T. that she was outside having a cigarette. At 3:47 a.m., K.T. texted Day, "I think I'm going to be raped." She testified that she was already in the vehicle when she sent that text message. At 4:07 a.m. K.T. texted Day, "Help me." Also at 4:07, she texted

Yu, "I think these guys are trying to rape me," and "Please help me." K.T. testified that she turned her phone back on after the assault around 5:20 a.m., and the screenshots reflect that at 5:21 a.m. she received numerous messages from Yu. At 5:22 a.m. K.T. texted Yu to call the police. Between 5:39 and 5:54 a.m. she texted Day multiple times that she was coming home and thought she had been raped, and at 6:10 a.m. texted Day that she had arrived.

¶ 13    K.T. left school for the remainder of the semester. She participated in a police investigation into the assault and was called to the police station in 2018. She told detectives and assistant state's attorneys what happened. She viewed a photo array but could not identify her attacker. At trial, when defendant was pointed out to her, she denied that she ever agreed to have sex with him.

¶ 14    On cross-examination, K.T. testified that Berlin closed at 4 a.m. She denied being at a party that night. The dancing platform she was on was about 48 feet from the bar's exit. She did not alert anyone while the man in the red sweater pulled her out of the bar and put her in the vehicle as it happened "extremely fast," and she "was like a rag doll." She was too concerned about her body and lacked "the wherewithal" to think of telling someone what was happening. She lacked the strength to struggle or pull away from him as she had been drinking and he was a "full-grown man." She did not try to exit the vehicle in which the man put her as she was not thinking rationally.

¶ 15    K.T. stumbled during the walk from the vehicle into the motel and would have fallen if the man had not held her up. She lacked control of her body as he always had his arms on her. She did not feel comfortable alerting the motel attendant that she was in trouble as he was "a fourth strange man" and she worried what would happen if she tried. When the man in the red sweater told her to undress she was scared and "frozen" and did not run or scream for help. When he held her neck, he "cut off [her] airway" and she struggled to breathe.

¶ 16    K.T. did not remember attempting to leave while the man was in the bathroom as she "was blacked out," had just suffered a violent assault and emotional trauma, and was not in her right mind. When he exited the bathroom, he continued assaulting her until the other men banged on the door. When Yu called, K.T. told Yu she was okay because she wanted the experience to end as quickly as possible. She did not try to run away from the man when they exited the motel room and asked him to take her home as she was "in shock."

¶ 17    K.T. admitted that she did not remember how much she drank in Day's room before they went out. She further admitted not knowing or remembering whether she had made certain statements following the incident, including telling: (1) the security guard that she had been at a party that night; (2) a paramedic that she did not remember how she came to be in a motel having sex with someone and that her memory was unclear; (3) a nurse that she only remembered bits and pieces of what had happened; (4) Dr. Emily Roben that she had anal intercourse with the man; (4) police in September 2018 that the man kept his arm around her during the drive to the motel; (5) anyone that the other men in the vehicle entered the motel room; (6) hospital personnel or police that the man strangled her; or (7) police that the other men had banged on the motel room door.

¶ 18    On redirect examination, K.T. testified that she tried to tell everyone everything that happened but those conversations were not as long as her testimony. She agreed that she remembered things at different times given her "blacking in and out." She was in the motel room when she texted Day and Yu at 4:07 a.m.

¶ 19    Day testified consistently with K.T. that they went to Berlin, the Big City Tap, and returned to Berlin. Day had between six and nine drinks and was drunk but not "falling over." She could tell K.T. was also intoxicated.

¶ 20    When they returned to Berlin, Day noticed a man in a red sweater "loitering" near them and behaving "creepily." Day went outside and had a cigarette approximately 10 feet from the front door. She texted K.T. that she was outside and K.T. texted back "I think I'm going to be raped." Thinking K.T. was still inside, Day texted her to come outside. When K.T. did not, Day searched in and around Berlin for K.T. A group of people whom she and K.T. had met at Berlin said they had seen K.T. enter a car. Day repeatedly phoned K.T. and took a cab to a police station. On the way, she called Yu. At the police station, Day showed officers K.T.'s text messages but they said they could not do anything and threatened to arrest Day if she did not leave. Day left, called her mom, and returned to the dorm as she felt there was nothing more to do.

¶ 21    After receiving K.T.'s later text messages, Day met her at the entrance to their dorm. K.T. exited a dark vehicle and began crying. They reported the assault to the security guard and a woman in charge of the dorm. An ambulance took K.T. and Day to the hospital. Day called K.T.'s brother. K.T.'s parents arrived at the hospital and that night took K.T. home for the semester.

¶ 22    Yu testified that, around 4 a.m. on January 30, 2016, Day called Yu and said K.T. was missing. Yu began calling and texting K.T. Her phone calls and text messages did not appear to be going through, indicating K.T.'s phone might be turned off. She texted K.T. nonstop until one of the messages appeared to go through, then called her. K.T. answered and Yu asked if she was okay. K.T. repeatedly said she was okay but she did not know where she was. Yu asked K.T. to send her location and hung up to allow K.T. to do so. K.T. did not send her location. Yu called again and K.T. seemed "very out of it." K.T.'s demeanor was muted, dull, and monotone. Yu asked to speak with someone else and K.T. put a man on the phone. The man said he was named John and he would take K.T. home. Yu kept calling to check that they were on their way to the dorm.

On cross-examination, Yu testified that she thought both she and K.T. gave the men the address of the dorm.

¶ 23    Teunta Cunningham testified that, in January 2016, he was a security-officer shift manager at K.T.'s dorm. He was working when K.T. arrived around 6:13 a.m. on January 30, 2016. She looked disheveled, emotional, and her eyes were red as if she had been crying. She told him she had been attacked. Cunningham escorted her into a security office. K.T. indicated she had been drinking at a party and "the next thing she remembers she woke up in a motel room," with someone on top of her having sex with her. Cunningham called the police. Paramedics arrived and K.T. left in an ambulance.

¶ 24    A paramedic, Matthew Clohessy, testified that he met K.T. in the security office. She appeared anxious, stressed, and fearful. She stated she had had nonconsensual sex in a motel room and had pushed the man off and told him to stop.

¶ 25    Dr. Emily Roben testified that she examined K.T. around 7 a.m. on January 30, 2016. K.T. appeared distraught, anxious, upset, and tearful. She stated she had drunk alcohol and then went to Berlin to dance and "the next thing" she knew she was in a motel room with a strange man. He penetrated her vagina and mouth with his penis. K.T. tried to say no and leave, but the man held her down by her arms. Dr. Danielle McCarthy performed a sexual assault kit on K.T. and informed Dr. Roben that K.T. had lacerations in her vagina and anus and bruising on her thighs near her genitals. On cross-examination, Dr. Roben testified that the lacerations in K.T.'s vagina and anus were minor and superficial.

¶ 26    Dr. McCarthy testified that K.T. was tearful and anxious. K.T. indicated she had been out drinking with a friend and woke up in a motel room with a man penetrating her mouth and vagina

with his penis. She asked him to stop and he did not and held her down. Dr. McCarthy performed the sexual assault kit to collect DNA evidence and search for injuries. She observed redness on K.T.'s labia, a one-centimeter tear on the entrance to her vagina, a small rectal tear, and redness and swelling on her upper thighs. K.T. also "had a lot of tenderness" during the internal exam.

¶ 27    On cross-examination, Dr. McCarthy testified that a "superficial" wound was one that did not go down to the muscle. The injuries to K.T.'s vagina and anus could be caused by intercourse. On redirect examination, Dr. McCarthy confirmed that K.T. also reported the man had penetrated her anus.

¶ 28    The State entered several stipulations, including that K.T.'s urine sample contained 0.191 grams of ethanol per deciliter and no drugs. Defendant was a possible donor of the male DNA profile found on vaginal and anal swabs from the sexual assault kit, and the frequency of that profile was 1 in 8.1 quintillion.

¶ 29    Chicago police detective John McNichols testified that he was assigned K.T.'s case in September 2018 and learned there was a DNA link to defendant. He compiled a photo array including defendant. K.T. viewed the array but could not identify anyone. In March 2019, McNichols arrested defendant. On cross-examination, McNichols testified that an Arabic-speaking detective interrogated defendant.[2]

¶ 30    Defendant testified that, on January 29, 2016, he went out with Ammar Alani and another friend named Ahmad.[3] Alani drove them to a bar or club. Defendant denied that it was Big City Tap. He drank one beer. They then went to Berlin. Defendant danced but not on the elevated dance

_____

[2] An Arabic interpreter was present in court and translated throughout the proceedings.
[3] Defendant testified through the Arabic interpreter.

floor. He drank a shot and a beer but was not intoxicated. K.T. approached him to dance. She told him she was interested in him and wanted to sleep with him. Defendant did not see K.T. drink alcohol or buy her any drinks.

¶ 31    About half an hour before the bar closed at 4 a.m., defendant left with Alani, Ahmad, and K.T. He denied grabbing K.T.'s arm or putting his arm around her and guiding her out. He asked Alani to take them to a motel. They walked one or two blocks to Alani's vehicle. K.T. did not sway or stumble and he did not pull her. She did not appear intoxicated. She entered the vehicle and they drove 10 to 15 minutes to a motel. Defendant and K.T. talked on the drive and K.T. "was not drunk."

¶ 32    Defendant asked K.T. if she would enter the motel lobby with him and Ahmad. Ahmad paid for the room as defendant did not have enough money. Defendant denied having his arm around K.T. Ahmad left and defendant asked K.T. to go to the room with him. He entered a room on the first floor and she followed him in. He closed the door but did not lock it.

¶ 33    Defendant used the bathroom. When he exited, K.T. sat naked on the edge of the bed. Defendant undressed and they had vaginal sex. She never said "stop" or "no." Defendant did not remember if they had oral sex or anal sex but then denied that they had oral sex. Afterwards, K.T. answered a phone call. Defendant went to the bathroom again for two or three minutes. When he exited, K.T. said she wanted to go home. They dressed, returned the room keys to the office, and reentered Alani's vehicle. K.T. used her phone on the way home. Defendant was arrested in March 2019 and agreed to speak with McNichols and the Arabic-speaking detective.

¶ 34    On cross-examination, defendant testified that he wore a rose or pink sweater that night. K.T. asked to dance with him. She was not on the elevated dance floor. She said she liked him,

wanted to get to know him, and agreed to go to a motel. K.T. said she wanted to have sex with him. She approached her friend, pointed at defendant, came back, and left with him. He did not have his arm around K.T. or hold her hand on the walk to the car or during the drive to the motel. In the motel room, defendant locked the door after he exited the bathroom before they had sex. He did not turn off K.T.'s phone. He was uncertain if they had anal or oral sex. K.T. texted and talked on her phone on the drive to and from the motel. Defendant denied that he or the other men spoke to her friend on the phone. K.T. put her address in his phone for directions.

¶ 35    When Chicago police officers showed him a photograph of K.T. he did not remember her and was not sure if she was the woman he had met at Berlin. Defendant first testified that he did not tell the detectives he and the woman he met had been drunk and then testified that he did not remember if he said they had been drunk.

¶ 36    Responding to questions from the court, defendant agreed that, at some point inside the club, K.T. told him, "I want to have sex with you."

¶ 37    Alani testified that, on January 29, 2016, he, defendant, and Ahmad went out to a dance club.[4] Alani drove. Before the club closed, Alani and Ahmad were outside smoking. Defendant exited with a "young lady." Defendant asked Alani to take them somewhere and they walked one or two blocks to Alani's vehicle. Defendant did not have his arm around the woman and she did not require support to walk. The woman entered the backseat and did not complain or try to get away. Defendant guided Alani to a motel 10 or 15 minutes away. There, defendant, the woman, and Ahmad entered the office. Defendant could not pay for a room so Ahmad paid. Ahmad

---

[4] Alani testified through the Arabic interpreter.

returned to the vehicle. Alani did not see defendant and the woman enter a motel room as he had leaned back his seat and was looking at his phone.

¶ 38    An hour or and an hour-and-a-half later, Alani called defendant and said he wanted to leave. Defendant told him he was "finished." Alani went to the motel room to use the bathroom. Defendant and the woman were "ready" and standing at the door. They all returned to Alani's vehicle. Alani did not remember the woman making a phone call. Defendant gave Alani a phone with an address on it. Alani drove there and they dropped the woman off.

¶ 39    On cross-examination, Alani testified that he saw the woman dancing with defendant at Berlin. Alani walked ahead of her and defendant to his vehicle so he was not always able to observe them. He played music softly on the drive to her home and could not hear any conversation between her and defendant.

¶ 40    In rebuttal, the State entered a stipulation that an official translation had been made of defendant's interview with the police in March 2019. The prosecutor read portions of the statement which included defendant asking why, if he had raped a girl, she had willingly gone with him into the motel. He admitted he and the girl had been drunk but denied that the girl had been so drunk she could not walk straight.

¶ 41    Following argument, the court found defendant guilty on all counts. The court stated it believed K.T.'s testimony that she was unwillingly taken to the motel. Given defendant's testimony that he and K.T. had wanted to, in the court's words, "connect romantically, sexually," the court did not believe defendant and Alani's testimony that defendant had no physical contact with K.T. until they got to the motel.

¶ 42    The court found credible Day's testimony that K.T. did not interact with defendant inside the club, and stated that testimony was "critical" and in "stark" contrast to defendant's testimony that K.T. told Day K.T. was leaving with defendant. The court believed it "inconceivable" that K.T. would tell defendant that she wanted to have sex with him when she texted her friends that she thought she would be raped. Further, the court stated that K.T.'s urine sample showed she was incapacitated as her blood alcohol level at the time she was examined was 0.191, more than twice the legal limit to drive. The court noted that the tears to K.T.'s vagina and anus showed that defendant used force in assaulting her. The court denied defendant's motion to reconsider or for a new trial.

¶ 43    Following a sentencing hearing, the court merged the majority of the charges. It sentenced defendant to six years' imprisonment on one count of aggravated kidnapping premised on secretly confining K.T. against her will and committing criminal sexual assault (720 ILCS 5/10-2(a)(3) (West Supp. 2015)) (count I). The court further sentenced defendant to consecutive terms of seven, six, and eight years' imprisonment on three counts of aggravated criminal sexual assault premised on defendant making contact between his penis and K.T.'s vagina, mouth, and anus, respectively, by the use or threat of force and causing K.T. bodily harm (720 ILCS 5/11-1.30(a)(2) (West Supp. 2015)) (counts IV, V, and VI).

¶ 44    On appeal, defendant challenges the sufficiency of the evidence to sustain his convictions. When presented with a challenge to the sufficiency of the evidence, we "must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. It is the factfinder's responsibility to weigh the evidence, resolve

conflicts in the testimony, and draw reasonable inferences from basic facts to ultimate facts. *Id.* Thus, we may not retry the defendant or substitute our judgment for the factfinder's on issues affecting the witnesses' credibility or the weight of the evidence. *Id.* We will not reverse a conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 45     In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution and allow all reasonable inferences from the evidence in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36. However, a factfinder's decision to accept testimony is not conclusive or binding and we may find that flaws in testimony made it impossible for a factfinder to reasonably accept any part of it. *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 46     Here, defendant was convicted of aggravated kidnapping (720 ILCS 5/10-2(a)(3) (West Supp. 2015)), and three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West Supp. 2015)).

¶ 47     To prove defendant guilty of aggravated kidnapping as charged, the State had to establish that he knowingly and secretly confined K.T. against her will and committed another felony upon her, namely, criminal sexual assault. 720 ILCS 5/10-2(a)(3) (West Supp. 2015). Confinement includes enclosure within a structure or automobile and "[s]ecret denotes concealed, hidden, or not made public." (Internal quotation marks omitted.) *People v. Siguenza-Brito*, 235 Ill. 2d 213, 227

(2009). Secrecy may be proven by the secrecy of the confinement or of the place of confinement. *Id.*

¶ 48 A person commits criminal sexual assault if he, as charged here, commits an act of sexual penetration and uses or threatens force. 720 ILCS 5/11-1.20(a)(1) (West 2016). Sexual penetration includes "any contact, however slight," between one person's sex organ and another person's mouth, sex organ, or anus. 720 ILCS 5/11-0.1 (West 2016).

¶ 49 To prove defendant guilty of aggravated criminal sexual assault as charged, the State had to establish that he committed criminal sexual assault premised on contact between his penis and K.T.'s sex organ (count IV), mouth (count V), and anus (count VI), by use or threat of force (720 ILCS 5/11-1.20(a)(1) (West 2016)) and caused K.T. bodily harm (720 ILCS 5/11-1.30(a)(2) (West Supp. 2015)).

¶ 50 Force includes overcoming the victim through superior strength or size, physical restraint, or physical confinement. 720 ILCS 5/11-0.1 (West 2016). There is no definite standard setting the amount of force necessary to show nonconsensual intercourse. *People v. Le*, 346 Ill. App. 3d 41, 50 (2004). However, force "does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, which causes the victim to submit to the penetration against their will." *People v. Blom*, 2019 IL App (5th) 180260, ¶ 31. Lying on top of the victim to use bodily inertia to prevent the victim from disengaging may constitute force. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 54. In the context of aggravated criminal sexual assault, bodily harm requires physical pain or damage such as lacerations, bruises, or abrasions. *People v. Hartfield*, 2022 IL App (1st) 200719, ¶ 19.

¶ 51     Viewing the evidence in the light most favorable to the State, we find it was sufficient to sustain defendant's convictions.

¶ 52     K.T. testified that she was intoxicated, with her limbs "loose" and "wobbly." Defendant "grabbed" her arm and "pulled" her off the dancing platform at Berlin. With one arm wrapped around her back, he led her to a vehicle and "slid" or "pushed" her in the backseat. She testified she was unsteady, "like a rag doll," and lacked the strength to struggle or pull away from defendant, who was "a full-grown man." Alani then drove the group to a motel, where defendant again wrapped his arm around K.T. and guided her into the office and then one of the rooms.

¶ 53     Inside the room, K.T. refused to undress. She was scared and "frozen." He got on top of her and removed her clothes, then his own. He then penetrated her vagina and anus with his penis while laying on top of her. The vaginal and anal penetration was "incredibly painful." K.T. told defendant to stop and tried to grab his hair or face. He pushed her head down, gripped her neck, and held her down by her arm. He cut off her airway and she struggled to breathe. He then flipped her over, stood over her with his hands on her neck, and thrust his penis in her mouth while she screamed. K.T. testified she never consented to sex with defendant. Drs. Roben and McCarthy testified that K.T. suffered tears on her vagina and anus and swelling and redness on her thighs.

¶ 54     The positive testimony of a single credible witness is sufficient to sustain a conviction. *Gray*, 2017 IL 120958, ¶ 36. Based on K.T.'s testimony, a rational trier of fact could find that defendant secretly confined K.T. against her will by pulling her off the dance floor and guiding her into the vehicle and motel room when she was too intoxicated, loose, and wobbly to struggle and pull away. See, *e.g.*, *Siguenza-Brito*, 235 Ill. 2d at 227 (finding secret confinement where

victim was placed in a vehicle, driven to a garage, pushed from the vehicle into the garage, and the garage door closed).

¶ 55    A rational trier of fact could also find that defendant committed criminal sexual assault by penetrating K.T.'s vagina, anus, and mouth with his penis by force or threat of force where he laid on top of her and held her down by her head and arm in order to penetrate her vaginally and anally and held her by her neck as he forced his penis into her mouth. See 720 ILCS 5/11-0.1 (West 2016) (force includes physical restraint); *Alexander*, 2014 IL App (1st) 112207, ¶ 54 (force may include bodily inertia to prevent disengagement).

¶ 56    Lastly, a rational trier of fact could find defendant inflicted bodily harm where the vaginal and anal penetration was "incredibly painful," defendant thrust into K.T.'s mouth with enough force to make her scream, he cut off her airway and she struggled to breathe, and the assaults resulted in tears to her vagina and anus and redness and swelling on her upper thighs. *Hartfield*, 2022 IL App (1st) 200719, ¶ 19 (bodily harm includes physical pain or damage such as lacerations, bruises, and abrasions); see also *People v. Johnson*, 2015 IL App (1st) 123249, ¶¶ 32-33 (testimony that defendant "applied pressure" on victim's airway, "which felt tight, interfering with her breathing," proved that defendant inflicted physical pain and therefore bodily harm).

¶ 57    Defendant argues K.T. willingly went to the motel room with him and consented to sex, and that her testimony to the contrary was incredible. Defendant points out that although K.T. indicated to security officer Cunningham and Drs. Roben and McCarthy that she did not remember how she got from Berlin to the motel room, she provided a detailed explanation at trial. K.T. further admitted that she never cried for help or tried to escape, and could not remember whether she had previously reported some details to which she testified. Defendant argues that Alani's testimony

corroborates his account of events and cites several cases in which sexual assault convictions were overturned based on incredible testimony from the alleged victims. See *Herman*, 407 Ill. App. 3d at 707-09; *People v. Yeargan*, 229 Ill. App. 3d 219 (1992); *People v. Walker*, 154 Ill. App. 3d 616 (1987); *People v. Blue*, 2023 IL App (5th) 220177-U.[5]

¶ 58    Consent is a defense to criminal sexual assault and aggravated criminal sexual assault and means "freely given agreement" to sexual penetration or conduct. 720 ILCS 5/11-0.1, 11-1.70(a) (West 2016). However, acts following the use of force are necessarily nonconsensual. *Blom*, 2019 IL App (5th) 180260, ¶ 31; see also 720 ILCS 5/11-0.1, 11-1.70(a) (West 2016) (a lack of resistance or submission resulting from the use or threat of force is not consent). The issue of consent is a credibility question best left for the factfinder who observed the witnesses' demeanor. *People v. Barbour*, 106 Ill. App. 3d 993, 998 (1982).

¶ 59    We are unpersuaded by defendant's challenge to K.T.'s credibility. The trial court properly considered the above evidence and decided that K.T. and Day's testimonies were credible and defendant's testimony was incredible. See *Jackson*, 2020 IL 124112, ¶ 64 (it is factfinder's responsibility to weigh evidence and resolve conflicts in testimony, and we may not substitute our judgment on the credibility of witnesses). We do not find K.T.'s explanations of why she did not cry out for help or attempt to escape and why her testimony may have varied slightly from reports she gave immediately after the assault to be so improbable that no factfinder could find her credible. See *Cunningham*, 212 Ill. 2d at 284 (finding that questionable parts of testimony did not

---

[5] Unpublished orders filed under Rule 23(b) after January 1, 2021, may be cited as persuasive authority. Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023)

make entire testimony unworthy of belief); *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 (minor inconsistencies in testimony do not automatically create a reasonable doubt of guilt).

¶ 60    We agree with the trial court that, had K.T. approached defendant and indicated she wanted to have sex with him, it is unlikely that she would text her friends that she thought she would be raped. We find it similarly unlikely that, had she merely regretted having consensual sex with defendant, she would (1) report a sexual assault to a security guard, paramedic, and doctors, (2) go home with her parents and miss the remaining semester of school, and (3) participate in a criminal investigation and prosecution.

¶ 61    Moreover, Day and Cunningham both encountered K.T. immediately upon her return to the dorm and testified that she cried and appeared disheveled. The paramedic and doctors testified she was distraught, anxious, upset, and tearful. Their testimony corroborates K.T.'s assertion that she did not consent to the sex acts. See *People v. Carlson*, 278 Ill. App. 3d 515, 522 (1996) (noting victim's testimony she did not consent to sex was corroborated by her prompt complaint and witnesses' testimony that she was upset and disheveled immediately following rape).

¶ 62    As to defendant's arguments that K.T. did not cry out for help or attempt to escape, K.T.'s urine sample contained 0.191 grams of ethanol per deciliter. As the trial court pointed out, that meant her level of intoxication was over twice the legal driving limit even hours after defendant took K.T. from the nightclub.[6] K.T. was intoxicated and testified that defendant pulling her from the bar happened fast, she was unsteady, and she lacked "the wherewithal" to alert someone that defendant was pulling her out of the bar.

---

[6] The Illinois Vehicle Code provides that "[a] person shall not drive" when "the alcohol concentration in the person's blood, other bodily substance, or breath is 0.08 or more." 625 ILCS 5/11-501(a)(1) (West 2020).

¶ 63    Moreover, K.T. credibly testified that she did not signal the motel attendant that she was in trouble as he was "a fourth strange man" and she did not know what might happen if she did. See *Blom*, 2019 IL App (5th) 180260, ¶ 31 (sexual assault victim need not "attempt to escape or to cry out where she is restrained by fear or where to do so would endanger her life"). Regarding discrepancies between K.T.'s testimony and what she reported to others after the assault, she testified that she tried to tell everyone everything but her conversations were not as long as her testimony and that she remembered different things at different times given her intoxicated state. We do not find that explanation incredible.

¶ 64    Ultimately, defendant's arguments are a request that we reweigh the trial evidence, which we may not do. *Jackson*, 2020 IL 124112, ¶ 64. The State's evidence was not so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. Thus, we affirm defendant's convictions for aggravated kidnapping and aggravated criminal sexual assault.

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66    Affirmed.