2024 IL App (1st) 210482-U

SIXTH DIVISION
March 22, 2024

1-21-0482

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 0905202 |
| | ) | |
| | ) | |
| NELON DRAKE, | ) | Honorable |
| | ) | Steve G. Watkins, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State proved defendant guilty beyond a reasonable doubt.  Remand is necessary because the court did not conduct an adequate inquiry into defendant's claims of ineffective assistance of trial counsel.

¶ 2    Following a bench trial, defendant, Nelon Drake, was convicted of criminal sexual

assault (720 ILCS 5/11-1.20(a)(1) (West 2020)) and was sentenced to seven years'

imprisonment.  On appeal, Drake argues that the State failed to prove him guilty beyond a reasonable doubt and he received an inadequate hearing on his post-trial motion alleging ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).  For the following reasons, we affirm Drake's conviction but remand for a preliminary inquiry into Drake's ineffective assistance of counsel claims under *Krankel*.

¶ 3                                BACKGROUND

¶ 4      Drake was charged with sexually assaulting the female victim, B.D., while she and Drake were in custody at the Markham courthouse on May 2, 2017.

¶ 5      At Drake's November 2019 bench trial, David Freeborn, who was also in custody, testified that on May 2, 2017, he was in a men's holding cell near courtrooms 105 and 106 in the Markham courthouse. Freeborn and Drake were being held in the same cell, along with another man.  Drake was wearing a "Papa Smurf" hat and the other man had "spidery dreads." Freeborn explained that there were two cells across from his cell with toilets and small windows that were used to hold female prisoners.

¶ 6      A female prisoner was visible in the window of one of the women's cells.  Drake and the man with the dreadlocks made comments about the woman's appearance, attempted to get her attention, and gestured for her to duck down and hide. The woman looked confused and moved away from the window. Drake then masturbated and ejaculated on the window of the cell.

¶ 7      Drake and the man with dreadlocks began banging on the cell door to get a guard's attention.  When a male guard arrived, both men asked to use the restroom.  They attempted to exit the cell at the same time, but the guard instructed them to go one at a time. The man with the dreadlocks went first.  When the guard brought him to the women's cell directly across the hall, the man claimed the cell had an odor and asked to use the other women's cell.  The man then

entered the other women's cell and remained there for five to ten minutes before banging on the door for the guard to return. A female guard let the man out and returned him to his original cell.

¶ 8     The female guard then asked Drake if there was "someone in that holding cell," and Drake responded "[t]hat she had been taken downstairs already." The female guard then admitted Drake to the same women's cell the other man had just left.

¶ 9     Freeborn could not see what occurred in the cell after Drake entered.  Five to ten minutes later, Drake banged on the cell door, and a sergeant arrived.  The sergeant returned Drake to his original cell. Drake and the man with dreadlocks were in "high spirit[s]," "laughing [and] talking about sexual stuff" and how they "got it in."  When Freeborn was later taken out of the cell, he saw an African American woman approximately ten to fifteen years older than him sitting inside the women's cell holding her face and crying. Later, when Freeborn was downstairs in the bullpen, he overheard Drake ask to speak to a sergeant and "request[] . . . a rape kit."

¶ 10    B.D. testified that she was fifty-three years old and had eight children and ten grandchildren.  She was in custody at the Cook County jail in Markham, Illinois, on May 2, 2017.  She was awaiting trial on a retail theft charge, and her case was being heard in courtroom 106 of the Markham courthouse. She was awakened at approximately 3:00 a.m. that day and given her seizure medication, which made her very drowsy. B.D. took Dilantin and phenobarbital for seizures, and Zoloft and Trazodone for bipolar disorder.

¶ 11    B.D. was patted down, handcuffed, taken to the courthouse by bus, placed in a bullpen downstairs, and then taken by elevator to an upstairs holding cell near the courtroom. The cell had a bench, a toilet with a shield, and a heavy door that locked every time it closed.  B.D. was the sole occupant in the cell. When B.D. was returned to the cell after her court hearing, her medication began to "kick in," making her "very tired." She fell asleep on the cell floor. B.D.

was awakened by the sound of the toilet flushing but was sleepy due to her medication. As B.D. attempted to stand, a man grabbed her from behind and "had [his] way" with her. B.D. felt "delusional" and sat down on the bench.

¶ 12    After that man left her cell, another man wearing a beige jail uniform and a hat entered her cell, approached her, and said, "[C]ome on" and "Let's go." B.D., who was sitting on the bench, responded, "[N]o, no" and refused to stand up. The man then "put [his] penis in [her] mouth," touched her head with his hands, ejaculated in her mouth, and left her cell. B.D. spit on the floor, "got [her]self together where [she] could stand up again," and began banging on the cell door, but no one came. B.D. stated that she did not know if the men "were let in there and the door was open or both of them went in at the same time or if it was open but I don't know."

¶ 13    When she looked out the window in her cell door, B.D. saw the man with the hat and another man "high fiving each other" in their cell. Eventually, a guard arrived and took B.D. downstairs to the bullpen.  B.D. told the guard and a "white shirt" that when she woke up, "some guys were in [her] cell" and that she had been assaulted.  B.D. wrote a note stating that she fell asleep in her cell, saw a man leaving her cell, and that she "believed this happened twice" but could not remember because of her medication. B.D. explained that she "didn't write enough" because she feared further abuse if she remained at the Markham courthouse.

¶ 14    The State introduced video clips of B.D. in the bullpen later that day.  According to B.D., the video showed her "praying [about] why . . . this stuff continue[d] to happen to [her]" and "stepping on the devil's head and taking [her] victory back." When B.D. returned to the jail, she told someone there what had happened to her and was taken to the emergency room at Stroger Hospital.  At the hospital, doctors and nurses collected evidence from her vagina, anus, and mouth.

¶ 15    B.D. testified that she received $3,250,000 in a civil lawsuit settlement from Cook County because of what happened to her at the courthouse, that she never engaged in consensual sex while she was an inmate at the jail, and that she did not make eye contact with the men in the cell across from her.

¶ 16    Centrayl Rogers testified that he was held in the holding cell of courtroom 106 at the Markham courthouse on May 2, 2017.  When he asked to use the restroom, a guard admitted him to a cell across the hall.  When he entered the cell, he was surprised to see a woman sitting in the corner because she was not visible from the cell window. The woman "had her face in her lap and [was] snuffling like she was crying." Rogers asked the woman if she was okay but she did not respond.  He used the restroom and left the cell. Rogers explained that the woman was "all the way in the corner against the wall" and was not visible from the cell window.

¶ 17    The State then called Tyres Baynes.  Baynes testified that he testified before the grand jury on June 14, 2017, but could not  recall the substance of his testimony. The State then introduced a transcript of Baynes's grand jury testimony as substantive evidence. Before the grand jury, Baynes testified that he was in a cell next to courtroom 106 at the Markham courthouse on May 2, 2017.  A short "elder[ly]" female prisoner was placed in the cell across the hall.  A male prisoner entered the woman's cell, "did a hand gesture like he was getting oral sex from a lady," and "laughed it off." Baynes later heard the man telling a guard that he "got put in a cell and got raped by a female" but Baynes "knew [the man] was lying."

¶ 18    The parties then stipulated that an employee at the jail would testify that Drake submitted an inmate grievance, in which he claimed that at 12:30 p.m. on May 2, 2017, he was in the holding cell for courtroom 105 at the Markham courthouse when he asked a guard to use the restroom. The guard admitted Drake to a cell used to house female prisoners without checking to

see if the cell was occupied, and then secured the cell and walked away. A female prisoner then "appeared from a blind spot" holding a needle containing a "blood looking substance," told Drake "it was AIDS in the blood," and threatened to poke Drake with the needle unless he allowed her to give him oral sex. The female prisoner then performed oral sex on Drake until he ejaculated in her mouth. Drake then left the cell. Drake and another prisoner told a sergeant that they had been sexually assaulted, and a rape kit was performed at a hospital. No needles were found in any of the holding cells.

¶ 19 The parties stipulated that an emergency room physician would testify that she examined B.D. at Stroger Hospital on May 2, 2017. She collected samples for a sexual assault kit. B.D. reported having taken prescription phenobarbital that day and complained of sleepiness and memory loss. Memory loss, drowsiness, and difficulty concentrating are common side effects of phenobarbital.

¶ 20 The parties stipulated that a nurse would testify that she collected samples for a sexual assault kit from Drake, including a blood standard and penile swabs.

¶ 21 The parties stipulated that an expert in forensic biology would testify that semen was detected on Drake's penile swabs.

¶ 22 The parties stipulated that an expert in forensic DNA analysis would testify that a mixture of DNA profiles was identified from the non-sperm fraction extracted from Drake's penile swab that "is consistent with originating from at least two people." The expert would also testify that the DNA profile identified from the sperm fraction "matche[d] [Drake's] DNA profile" and the second DNA profile was "consistent [with] having originated from [B.D.]."

¶ 23 After the State rested, the parties stipulated that Deputy Sheriff Kalina would testify that at approximately 1 p.m. on May 2, 2017, she was informed by Sergeant Garrett that two

prisoners alleged that they had been placed in a cell with B.D. Kalina said she told the sergeant that "at no time did these inmates come in contact with each other." Kalina transported B.D. "up to the courtroom from the female lockup" at approximately 10:45 a.m. and placed her "in a single cell by herself." Kalina returned B.D. to the women's lockup at approximately 1:45 p.m.. When Sergeant Garrett interviewed B.D. in front of Kalina and asked if anything unusual happened to her in her cell, B.D. responded, "[N]o."

¶ 24     The defense did not present any witnesses. After hearing all of the evidence, the court found Drake guilty of criminal sexual assault.

¶ 25     In his posttrial motion filed at Drake's request, Drake's trial counsel argued, *inter alia*, that he provided ineffective assistance in that he: (1) "[f]ailed to object to the State's excessive use of leading questions on direct examinations, and therefore allowed the State to suggest the desired answer without its witnesses giving their own independent testimony;" and (2) "[f]ailed to call necessary witnesses and bring forth possible exculpatory evidence when counsel failed to call any of the law enforcement/correctional officers that may have been witness to events of relevance." At a hearing on the motion, the court asked Drake if he asked counsel to make the ineffective assistance of counsel claims. Drake responded that he did and added that he "told him when we got done, like why you didn't call the officers and people that was there that could have made a big difference in the trial."

¶ 26     At a hearing on November 23, 2020, trial counsel stated that it was his "choice" not to call those witnesses. He stated that he "didn't call any witnesses. I could have, I should have, and that was my choice alone except for the extent that [Drake] was admonished about his rights to testify." Drake informed the court that he wished to continue with his current counsel, and the court instructed trial counsel to submit a memorandum explaining "why [Drake] is entitled to a

*Krankel* hearing." Trial counsel then filed a four-page memorandum arguing that Drake should be afforded a *Krankel* hearing and new counsel should be appointed, arguing that his representation was deficient in that there "were at least 4 sworn correctional officers that were involved in the movement of inmates, had conversations with witnesses and have direct knowledge or directly witnessed the events that are of relevance. . . . Specifically, the officers were witness to the demeanor of [B.D.], had direct knowledge of [B.D.'s] condition . . . and witness[ed] .. . potentially exculpatory evidence." The memorandum concluded that Drake may have suffered prejudice from counsel's failure to call these witnesses.

¶ 27     At the subsequent hearing, the State asked the court to inquire further of Drake, stating "I think that your inquiry was sort of cut short and then you never really finished it." The circuit court did not have a transcript from the prior hearing and therefore did not address the State's request. The case was continued and at the next hearing, the circuit court rejected Drake's ineffective assistance claims on the merits in a written order denying his posttrial motion. The court stated:

> "Here, counsel admits to being ineffective for the reasons stated above. Trial
> counsel's own admission of incompetence is not dispositive of an ineffectiveness claim;
> the standard in an ineffectiveness claim is an objective, not subjective, one. *People v.*
> *Harris*, 206 Ill. 2d 1, 63-[6]4 (2002).
>
> Petitioner contends that trial counsel was ineffective for failure to object during
> direct examination when [the prosecutor] was asking leading questions. The decision of
> whether or not to object to trial testimony or closing arguments is generally a matter of
> trial strategy. *People v. Evans*, 209 Ill. 2d 194, 221 (2004). As such, it will be left
> undisturbed. See *People v. Childress*, 191 Ill. 2d 168, 177 (2000) (trial counsel's strategic

choices are virtually unchallengeable). Indeed, "[t]he evaluation of counsel's conduct cannot properly extend into areas involving the exercise of professional judgment, discretion or trial tactics." *People v. Franklin*, 135 Ill. 2d 78, 118-19 (1990) (citations omitted). For that reason, this court does not find that counsel was ineffective when he decided not to object.

Defendant alleges that trial counsel was incompetent for failing to call certain witnesses. "In general, whether to call a particular witness is a matter of trial strategy." *People v. Flores*, 128 Ill. 2d 66, 85-6 (1989) (citations omitted). Such a claim cannot form the basis for a claim of ineffective assistance of counsel unless the trial strategy is so unsound that counsel can be said to have entirely failed to conduct any meaningful adversarial testing of the State's prosecution. *People v. Jones*, 323 Ill. App. 3d 451, 457 (1st Dist. 2001). Petitioner has failed to explain the significance of their testimony. Therefore, his claim that counsel was ineffective for failing to contact the proposed witnesses must fail.

Because defendant's counsel was not objectively unreasonable, appointment of new counsel [is] not needed. When a defendant makes such a claim, the trial court should first examine its factual basis. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the pro se motion. *People v. Jolly*, 2014 IL 117142, 29; *People v. Moore*, 207 Ill. 2d 68, 77-78.

* * *

This court examined the factual basis of defendant's claims. After conducting preliminary investigations into the factual matters underlying the claims and reviewing

transcripts, motion, arguments, [defense counsel's] memorandum, and the law, this court finds that defendant's claims lack[] merit and pertain[] only to matters of trial strategy [T]his court will not appoint counsel and the claims are denied."

¶ 28  The court sentenced Drake to seven years' imprisonment. Defendant now appeals.

¶ 29                                    ANALYSIS

¶ 30  Drake first argues that the State failed to prove him guilty of criminal sexual assault. Specifically, Drake argues that the State's evidence failed to establish that he physically compelled B.D. to submit to the act of sexual penetration through the use of force where the only evidence was that he used his hand to hold B.D.'s head while he penetrated her mouth.  The State argues that the evidence shows that Drake "overc[ame B.D.] by use of . . . physical confinement" when he penetrated her mouth with his penis inside her locked cell at the Markham courthouse.

¶ 31  On appeal, when the defendant challenges the sufficiency of the evidence the reviewing court must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A reviewing court affords great deference to the trier of facts and does not retry the defendant on appeal." *People v. Smith*, 318 Ill. App. 3d 64, 73 (2000). "A reviewing court must allow all reasonable inferences from the record in favor of the State." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *Id*.

¶ 32  "It is within the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the

evidence." *Id*. It is not the duty of the trier of fact to accept any possible explanation that favors the defendant's innocence and "elevate it to the status of reasonable doubt." *People v. Siguenza–Brito*, 235 Ill. 2d 213, 229 (2009). "A reviewing court will not substitute its judgment for that of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 33    There are two elements of criminal sexual assault. 720 ILCS 5/11-1.20 (West 2020). First, a defendant must commit an act of sexual penetration. *Id*. § 11-1.20(a).  Second, a defendant must use force or threaten the use of force. *Id*. § 11-1.20(a)(1).  Illinois law defines "force or threat of force" as including, but not limited to, situations where the accused (1) uses or threatens to use force or violence on the victim, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or (2) overcomes the victim by use of superior size or strength, physical restraint, or physical confinement. 720 ILCS 5/11-0.1 (West 2020). "Force does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, which causes the victim to submit to the penetration against their will." *People v. Blom*, 2019 IL App (5th) 180260, ¶ 31. "Beyond the fact that the requisite force must be 'something more than the force inherent in the sexual penetration itself,' there is 'no definitive standard establishing the amount of force which the State is required to prove in order to prove criminal sexual assault, and each case must be considered on its own facts.' " *People v. Parker*, 2016 IL App (1st) 141597, ¶ 35 (quoting *People v. Alexander*, 2014 IL App (1st) 112207, ¶¶ 52, 54; *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38.) "If circumstances show resistance to be futile or life endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." *People v. Bolton*, 207 Ill. App. 3d 681, 686 (1990). "The question of whether force or threat of force was used is best left to the trier of fact who heard the evidence

and observed the demeanor of the witnesses." *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38.

¶ 34　　The facts of this case are undoubtedly unique. Nevertheless, viewing the evidence offered at trial in the light most favorable to the State, a rational trier of fact could have found that the evidence established beyond a reasonable doubt that Drake committed an act of sexual penetration by force or the threat of force. B.D. testified that at the time of the incident, she was confined in a cell in the Markham courthouse. Drake gained access to her cell, told B.D. to "come on," and "let's go" and placed his hands on her head and forced her to perform oral sex on him until he ejaculated. B.D. testified that she did not consent to oral sex and said "no" prior to the penetration. The trial court found that B.D. was a credible witness and further found that her version of events was confirmed by the DNA analysis on the penile swab taken from Drake. The court found that Drake's version of events "couldn't be further from the truth." We defer to the trial court's credibility determination. *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26 ("A trial court's credibility determinations are entitled to great deference, and they will rarely be disturbed on appeal.").

¶ 35　　This court has upheld criminal sexual assault convictions based on similar facts where the victim was confined, and resistance would have been futile. In *People v. Satterfield*, 195 Ill. App. 3d 1087 (1990), the defendant was found guilty of criminal sexual abuse where the evidence showed that he approached the victim in the parking lot of a veterinary office while the victim was seated on the passenger side of her mother's car and crying about her injured dog. 195 Ill. App. 3d 1091. The defendant opened the car door and told the victim not to worry about her dog. *Id.* When the victim continued to cry, the defendant "poked [her] breast." *Id.* at 1092. The victim testified that she was prevented from "do[ing] anything" because the defendant "was in the door and [she] had a dog on [her] lap and [her] mom was sitting next to [her]." *Id.* We

upheld the defendant's conviction, finding that the victim had nowhere she could move to avoid the defendant's advances and "virtually was pinned in the car" and thus "physically confined." *Id.* at 1097.

¶ 36    In *People v. Blom*, 2019 IL App (5th) 180260, ¶¶ 12-13, the defendant sexually penetrated the victim during a massage when he was alone with her in a windowless room. The court found sufficient evidence of force based on the victim's testimony that she felt unsafe because she was "a woman in a room alone with a man who appear[ed] to have bad intentions," that she was unsure of "the range of possible actions [the defendant] was willing to take," and that she "did not think anyone would be able to hear her if she yelled out." *Id.* ¶¶ 13, 32.

¶ 37    In *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 4, 13, the defendant was found guilty of multiple counts of aggravated criminal sexual abuse and criminal sexual assault after he approached two 13-year-old girls and told them "they could make money modeling." The defendant asked the victims if he could take pictures of them in his car. *Id.* ¶ 13. He took the first victim to his car, and took some photographs of her.  Then he pulled down the victim's shorts, "spread her legs," and " 'touched [her] vagina area.' " *Id.* ¶ 14. After the victim slapped the defendant's hand, he "lifted her shirt" and "touched her breasts." *Id.* The victim tried to leave, but "the doors were locked, and [the] defendant blocked her with his arm when she tried to get out of his car." *Id.*  She was eventually able to get out of the car. *Id.*

¶ 38    Without knowing what happened to the first victim, the second victim then approached the defendant's car. *Id.* ¶ 19. The defendant took some photographs of the second victim and then put his hand inside her shorts and touched her vagina. *Id.* ¶ 20. The victim tried to exit the car, but the defendant "blocked the door with his body." *Id.* ¶ 21. The victim was eventually able to get out of the vehicle. *Id.* The trial court found this evidence established force or threat of

force. *Id*. ¶ 39.

¶ 39    On appeal, we found the evidence sufficient to establish that the defendant was proven guilty beyond a reasonable doubt.  We found that the defendant, "committed sexual acts, and blocked [the victims] when they tried to leave, from which the jury could reasonably infer that defendant overcame [the victims] by physical confinement." *Id*.  We further noted that "[a]lthough there was no testimony about defendant's size or weight, the victims were 13-year-old girls and defendant was a 35-year-old man, who brought them separately into the backseat of his vehicle, committed sexual acts against them, and then blocked them from leaving when they tried to leave."  Nevertheless, "the jury had the opportunity to view the victims and defendant at trial and could have properly considered the size disparity when viewing [the victims'] testimony and hearing their testimony about the sexual acts and conditions under which they took place." *Id*. ¶ 41.

¶ 40    In *People v. Sanford*, 2022 IL App (4th) 210030-U, ¶¶ 5-6, *appeal denied*, 197 N.E.3d 1112 (Ill. 2022), the defendant, a paramedic, assaulted a patient in the back of an ambulance on the way to a hospital. The court found sufficient evidence of force where the defendant "unzipped his pants, exposed his penis, and pushed [the victim's] head toward his lap," even though the victim did not object or resist and in fact "used her hand to place defendant's penis in her mouth after defendant pushed her head toward his lap." *Id*. ¶¶ 31-32, 36. The court found that the victim's actions "merely showed a lack of resistance" but that "resistance was futile" given that the victim, who was "suicidal and experiencing a nervous breakdown," was "confined in a moving vehicle" with the defendant who was the only person in the back of the ambulance with her.  The defendant was physically larger than her, and she felt intimidated and afraid. *Id*. ¶¶ 31-32, 36.

¶ 41    While there was no real testimony here about the size disparity between Drake and B.D. and B.D. did not testify that she resisted performing oral sex on Drake, a rational trier of fact could have concluded that acts of resistance would have been futile under the circumstances. Sheriff's deputies, whose duty was to maintain control and order in the holding cell, twice admitted men to her cell and left them there unsupervised.  B.D. was confined by herself in a holding cell in the Markham courthouse, where she did not feel safe and was not free to leave. She had to bang on the cell door to summon a deputy sheriff.  The door of the holding cell "clink[ed] and lock[ed] every time it close[d]." Regardless of whether the cell door was locked at the time Drake was inside, B.D. was confined to her cell and was not free to leave.  B.D. was "drowsy, very tired, [and] sleepy" from her medication.  Drake was the only person in the holding cell with her at the time.  Drake held her head and forced her to perform oral sex.  See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 ("When considering the evidence of force, we may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred."). Based the facts of this case, when viewed in the light most favorable to the State, we find that use of force was proven when the State established that Drake overcame B.D. by the use of superior size or strength, physical restraint, or physical confinement. 720 ILCS 5/11-0.1 (West 2020).  Accordingly, we find the State proved that Drake committed the offense of criminal sexual assault beyond a reasonable doubt.

¶ 42    Drake next argues that the trial court failed to adequately inquire into his ineffective assistance of counsel claims.  Specifically, Drake argues that posttrial, defense counsel admitted that he was ineffective when he failed to call any of the correctional officers on duty on the day of the incident and failed to object to the State's use of leading questions, but the court failed to adequately inquire into this admission.  Drake claims that because the court's failure denied him

an adequate record for review, we should remand this matter for a new preliminary *Krankel* inquiry where the court can properly inquire about these specific claims. The State responds the court's inquiry of Drake's claims was adequate and no remand is necessary. We agree with Drake.

¶ 43    A *Krankel* hearing "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. Normally, a *pro se* defendant raises an ineffective assistance claim posttrial, but as occurred in this case, an attorney can raise the issue of his own ineffectiveness if he does so clearly and at the direction of the defendant. *People v. Bates*, 2019 IL 124143, ¶ 33. A *Krankel* hearing "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" (*People v. Patrick*, 2011 IL 111666, ¶ 39) and "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal" (*id*. ¶ 41). See *People v. Roddis*, 2020 IL 124352, ¶ 34.

¶ 44    When a defendant files a *pro se* posttrial motion alleging trial counsel's ineffectiveness, the court must conduct a preliminary inquiry to examine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). A preliminary *Krankel* hearing "should operate as a neutral and nonadversarial proceeding. *Jolly*, 2014 IL 117142, ¶ 38. The trial court is not automatically required to appoint new counsel to assist the defendant; rather, the court should first examine the factual basis of the defendant's claim. *Moore*, 207 Ill. 2d at 77-79. A trial court may conduct its examination by: (1) asking trial counsel about the facts and circumstances related to the defendant's allegations; (2) asking the defendant for more specific information; or (3) relying on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Id*. However, "[t]here is no set format for how an initial inquiry into a

defendant's pro se allegations of ineffective assistance of counsel should be conducted." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85. A court need not expressly state that it is conducting a *Krankel* inquiry. *People v. Short*, 2014 Il App (1st) 121262, ¶ 121.

¶ 45    If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id.* However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id.* The newly appointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position. *Roddis*, 2020 IL 124352, ¶ 36. Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. *Id.* ¶ 33.

¶ 46    After reviewing the record, we find that the proceedings below did not properly conform to *Krankel* procedures. The record does not demonstrate an examination of the factual bases of Drake's claims of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77-78. As discussed, defense counsel raised his ineffectiveness in a posttrial motion, and indicated that he had "spoken with Mr. Drake about the post-trial motion, and it was his intent to allege those allegations." Drake indicated to the court that he had not seen the motion filed on his behalf by defense counsel. The court then read the relevant portions to Drake on the record. The court asked Drake if he asked his attorney to make those allegations. Drake replied that when the trial was over, he asked his attorney, "why you didn't call the officers and people that was there that could have made a big difference in the trial because I feel like- - to answer your question, yes, sir." The court then confirmed that Drake asked defense counsel to present the allegations of ineffective assistance in the posttrial motion. The court then indicated that it believed it needed

17

to, "based on those answers, conduct a *Krankel* hearing." After a short recess, the court asked Drake if he wished "to continue with Mr. Collins as your attorney?" Drake responded, "Yes." The court then continued the matter but asked defense counsel to prepare a "brief or memorandum of law as to why your client is entitled to a *Krankel* hearing."

¶ 47 On the next court date Drake was not present in court. Defense counsel did file the memorandum of law as requested by the court. In the memorandum, defense counsel urged the court to appoint new counsel to investigate and argue defendant's claim of ineffective assistance of counsel. Counsel admitted that his "performance was unreasonable deficient (sic), and that deficient performance caused Drake prejudice." Counsel further stated that "there were at least 4 sworn correctional officers that were involved in the movement of inmates, had conversations with witnesses and have direct knowledge or directly witnessed the events that are of relevance." Counsel further stated that "these officers were witness to the demeanor of the complaining witness, had direct knowledge of the condition of the complaining witness and witness to potentially exculpatory evidence" and the failure to call them may have resulted in prejudice to Drake. Defense counsel did not explain why these witnesses were not called. The case was continued.

¶ 48 On the next court date, the court acknowledged that the case was set for a *Krankel* argument. The State informed the court that the case was set "for Krankel inquiry for you to inquire of the defendant and determine if the public defender needs to be appointed or another lawyer." Defense counsel asked the court to appoint new counsel on the matter to "present those arguments on behalf of Mr. Drake." The court noted that it did not have a transcript from the previous hearings, but it did have the memorandum of law filed by defense counsel. The court indicated that it recalled "asking general questions" at the previous hearing. The State then

responded that,

> "I believe you might have started to inquire from Mr. Drake, you know, what he didn't care for in terms of Mr. Collin's (sic) performance or what he perhaps wanted his lawyer to do that he didn't. But I think that your inquiry was sort of cut short and then you never really finished it.
>
> So it's the State's position that we would be respectfully ask Your Honor to make those inquiries of Mr. Drake to see if he even meets the threshold of moving on to the next stage of analysis which would be Your Honor appointing a new attorney to look into the allegations."

The court then continued the matter again to obtain a transcript of the initial proceedings "because the defendant answered questions on it and I want the benefit of those questions and answers before going forward."

¶ 49 On the next court date, without further inquiries or any hearing, the court entered a six-page written order denying Drake's motion for a new trial and denying Drake a *Krankel* hearing. The court found that trial counsel was not ineffective and therefore, the appointment of new counsel was not necessary.

¶ 50 A main concern for a reviewing court is whether "an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel" took place. *Moore*, 207 Ill. 2d at 77-78 (citing *People v. Johnson*, 159 Ill. 2d 97, 125 (1994) ). "The law requires * * * some type of inquiry into the underlying factual basis, if any, of the defendant's *pro se* posttrial claim of ineffective assistance of counsel." *Id*. at 79.

¶ 51 We find the court did not conduct an adequate inquiry under *Krankel* into Drake's ineffective assistance of trial counsel claims. While the court acknowledged the ineffective

assistance claim here, the court did not inquire into the identity of the witnesses, the effort made by defense counsel to secure any of the alleged witnesses' testimony, what the witnesses would testify to, or the importance of this testimony to the defense strategy. See *People v. Peacock*, 359 Ill. App. 3d 326, 339 (2005) (recognizing that the trial court was not in a position to evaluate the defendant's *pro se* claim of ineffective assistance for failure to subpoena witnesses simply by relying on facts within its knowledge where the record did not reveal who the witnesses were or what they would have testified to). Although the court gave defense counsel an opportunity to explain his ineffectiveness claims in a written memorandum of law, that memorandum did not address the specifics of the issues raised and did not identify the witnesses, the efforts made to secure them, or what they would say. Despite the fact that there was some discussion on the record between defense counsel and the court, as the State pointed out to the trial court on two separate occasions, the court did not sufficiently question Drake about his claims of ineffective assistance of counsel. See *People v. McLaurin*, 2012 IL App (1st) 102943 (remanded for the limited purpose of allowing the trial court to make a more complete inquiry into defense counsel's efforts "to investigate" the witness and "secure his testimony for the second trial"); *People v. Willis*, 2013 IL App (1st) 110233, ¶ 72 ("the trial court has a duty to conduct an adequate inquiry when allegations of ineffective assistance arise. (Citation omitted.) The trial court cannot simply ignore or fail to address a claim of ineffective assistance of counsel without consideration of the claim's merits").

¶ 52 Based on this record, this matter must be remanded for a new preliminary *Krankel* hearing. On remand, the trial court should engage in a preliminary inquiry as required under the case law. *Moore*, 207 Ill. 2d at 79. This way, an adequate record will be made of Drake's claims of ineffective assistance of counsel. If, after a hearing, the trial court determines the claims lack

merit or pertain to trial strategy, it can deny the motion. If the trial court determines the claims have some merit, the court can proceed to a second stage adversarial hearing. If Drake is unsuccessful at either stage, he can appeal if he chooses. *Krankel*, 102 Ill. 2d at 189.

¶ 53                                    CONCLUSION

¶ 54    Based on the foregoing, we affirm in part and remand in part.

¶ 55    Affirmed in part; remanded in part.