**NOTICE**
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250290-U

NO. 4-25-0290

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 4, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| RICHARD L. GAINES, | ) | No. 22CF1227 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court reversed two of defendant's three convictions for criminal sexual assault because of insufficient evidence and remanded for a new sentencing hearing.

¶ 2   In December 2022, the State charged defendant, Richard L. Gaines, with (1) one count of involuntary sexual servitude of a minor, a Class X felony (720 ILCS 5/10-9(c)(2) (West 2022)), (2) four counts of criminal sexual assault, a Class 1 felony (*id.* § 11-1.20(a)(1)), (3) eight counts of aggravated criminal sexual abuse, a Class 2 felony (*id.* § 11-1.60(c)(1)(ii)), and (4) one count of child pornography, a Class 1 felony (*id.* § 11-20.1(a)(4)). Generally, the State alleged a pattern of sexual assault and abuse committed by defendant against J.C., a minor at least 13 years old and under 17 years old, occurring between May 1, 2022, and August 4, 2022.

¶ 3   In September 2024, a jury found defendant guilty of four counts of criminal sexual assault and eight counts of aggravated criminal sexual abuse. Because some of the counts merged,

the trial court ultimately sentenced defendant to three mandatory consecutive 15-year terms for the criminal sexual assault convictions and two consecutive 7-year terms for the criminal sexual abuse convictions. The criminal sexual abuse sentences ran consecutively to the criminal sexual assault sentences, resulting in an aggregate sentence of 59 years.

¶ 4　　　　Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he committed two of the counts of criminal sexual assault (*id.* § 11-1.20(a)(1))—specifically, that he "used or threatened force to put his penis in JC's mouth or to touch her vagina with his mouth." He also argues that (1) his sentence was excessive because the trial court did not apply the rule of lenity to an ambiguous sentencing statute and (2) his sentence was excessive because the court did not properly consider the circumstances of the offense or mitigating evidence.

¶ 5　　　　We agree that the evidence was insufficient to sustain two of defendant's convictions for criminal sexual assault. Accordingly, we reverse those convictions and remand for a new sentencing hearing.

¶ 6　　　　　　　　　　　　　　I. BACKGROUND

¶ 7　　　　　　　　　　　　　　A. The Charges

¶ 8　　　　In December 2022, the State charged defendant with (1) one count of involuntary sexual servitude of a minor, a Class X felony (*id.* § 5/10-9(c)(2)), (2) four counts of criminal sexual assault, a Class 1 felony (*id.* § 11-1.20(a)(1)), (3) eight counts of aggravated criminal sexual abuse, a Class 2 felony (*id.* § 11-1.60(c)(1)(ii)), and (4) one count of child pornography, a Class 1 felony (*id.* § 11-20.1(a)(4)).

¶ 9　　　　The State alleged a pattern of sexual assault and abuse committed by defendant against J.C., a minor, primarily occurring between May 1, 2022, and August 4, 2022. Generally, the State alleged that defendant used force to engage in multiple acts of sexual penetration

involving his penis and J.C.'s mouth and vagina. The charging documents also alleged several instances of defendant performing oral sex on the victim, some of which involved the use of force. Additionally, the State alleged multiple acts of sexual conduct, including defendant touching J.C.'s breast and repeated instances of vaginal penetration occurring both throughout the broader three-month period and during a specific two-day window in late July 2022.

¶ 10        Prior to the jury trial, the State dismissed counts I and II, which were the counts of involuntary sexual servitude of a minor and child pornography.

¶ 11                                B. The Trial

¶ 12        In September 2024, the trial court conducted defendant's jury trial.

¶ 13                                1. *J.C.*

¶ 14        J.C. testified that she was born in August 2007. At the time of the trial, she was 17 years old, a junior in high school, and had been living with her grandparents, cousin, and younger brother, G.C., for approximately two years. At the time of the events involving defendant, J.C. resided with April M. (her mother), her stepfather, and G.C. at the Quality Inn located on East Empire Street in Bloomington, Illinois, for about one and a half years. The family occupied a room on the first floor, while defendant stayed in a separate room on the second floor.

¶ 15        J.C. first met defendant in the summer of 2021, shortly after she turned 14 years old. She and her mother were outside the hotel, "smoking[ and] drinking." At some point, J.C. left the car to go inside the hotel room; defendant then approached her and said, "Hi, Beautiful." J.C. looked around, realized defendant was speaking to her, and told him, "I [am] 14." She then walked away. However, defendant followed her back to her mother's vehicle and "proceeded to start flirting with [her] while in the presence of [her] mother." J.C. attempted to roll up the car window to avoid him but was unable to do so.

¶ 16         J.C. testified it was common for her to smoke cannabis and cigarettes and drink alcohol with her mother. J.C. told her mother she was uncomfortable spending time with defendant, but her mother continued to allow defendant to spend time with them. When defendant flirted with J.C., J.C.'s stepfather was typically either working or inside the hotel with her brother. Eventually, defendant's conduct escalated from "hanging out" to physical contact; specifically, defendant began grabbing J.C.'s hand and rubbing her thigh. These incidents usually occurred in a car or in defendant's hotel room while J.C.'s mother was either present or away getting drugs.

¶ 17         J.C. testified that the physical contact first escalated beyond touching and rubbing at the outdoor pool at the Quality Inn. The incident occurred during the daytime while the pool was open for the season. J.C. stated she went to the pool alone and defendant joined her later. J.C. described the incident as follows:

> "At first, I was just swimming, doing my usual thing, and then he would start following me.
>
> ***
>
> After *** I stopped swimming and he came up to me, he grabbed my hips and proceeded to push my lower underwear to the side and proceeded to put his penis inside of my vagina."

¶ 18         J.C. told her mother about the incident at the pool, but her mother did nothing. Following this incident, J.C. and defendant had sexual intercourse on additional occasions in defendant's hotel room. At defendant's prompting, J.C. also performed oral sex on defendant in the bathroom of his hotel room on multiple occasions. J.C. stated she "lost count" of how many times this occurred. Defendant also performed oral sex on her. She noted that she never tried to fight defendant off and never told him "no."

¶ 19        J.C. described instances when defendant would have sex with her from behind while she was on her hands and knees, restrained by handcuffs. She described the mechanism of restraint as follows:

> "There was a bar in the hotel room, in the bathroom to be precise. He would proceed to put the handcuffs through there, cuff my wrists above my head and proceeded to put his penis inside of my vagina."

¶ 20        J.C. did not say how many times this happened. When asked by the State whether defendant ever said "anything to [her] about the future or anything like that," the following exchange occurred:

> "A. He would say I would be his wife. He tried to propose to me.
>
> Q. Did you want to marry him?
>
> A. No.
>
> Q. Did you tell him this?
>
> A. No, I didn't.
>
> Q. How would he react after these proposals?
>
> A. If I say no, he would say he would kill himself."

¶ 21        J.C. testified that on July 25, 2022, her mother was arrested for bank robbery. Approximately one week prior to the arrest, J.C.'s mother instructed J.C. to introduce defendant to her stepfather as her boyfriend. Following the arrest, J.C. stayed with her stepfather at the Red Roof Inn until August 4, 2022. They subsequently stayed at a Super 8 for one week.

¶ 22        J.C. stated that the sexual abuse continued after they left the Quality Inn. Specifically, J.C. testified regarding incidents at the Red Roof Inn as follows: "He would put his penis inside of my vagina, force my brother out of the hotel room. It took my brother sort of

catching on to what was going on to start saying no."

¶ 23    J.C. testified that on August 4, 2022, her grandmother and aunt arrived to take J.C. and her brother to Champaign, Illinois. J.C. explained that while they were at the Super 8, Detective Jesse Lanphear arrived and requested permission to search the cell phones belonging to J.C., her brother, and defendant. J.C. said they "all signed the paper." J.C. further testified that Detective Lanphear returned later that day, removed defendant from the hotel room, and began questioning him.

¶ 24    J.C. testified about two interviews conducted at the McLean County Children's Advocacy Center (CAC). The first interview took place in August 2022. J.C. stated her grandmother and aunt brought her to the interview, which was recorded. During this interview, J.C. told the investigator that she and defendant had "feelings" for one another but had not done anything sexual in nature. Despite the investigator repeatedly asking about the nature of the relationship, J.C. repeatedly denied any sexual contact.

¶ 25    J.C. explained that she did not tell the truth during the first interview because her mother told her not to. J.C. testified that, to her knowledge, her mother was subsequently convicted of obstruction of justice. J.C. further explained her mindset during the first interview as follows: "I was scared for my life. I was being threatened on a daily basis."

¶ 26    J.C. testified that she returned for a second interview at the CAC three months later, on November 4, 2022. J.C. stated it was her idea to participate in the second interview because the lying was "taking a toll" on her and she wanted to tell the truth. By this time, J.C. had been in counseling. During this second interview, J.C. disclosed the sexual acts she testified about at trial.

¶ 27    2. *Lanphear*

¶ 28    Lanphear, now a sergeant with the Bloomington Police Department, testified that

he was assigned to investigate the robbery case involving April M. According to Lanphear, that investigation began as follows:

> "Um, using surveillance footage and some of the evidence that we had at the scene, we ended up tracking our suspect back to a hotel, the Quality Inn and Suites on East Empire Street in Bloomington. There we identified our suspect, or one of the suspects, as April M[.], and made contact with her there."

¶ 29 April was eventually located in defendant's hotel room. When Lanphear made contact with her, defendant was present in the room. During this time period, Lanphear collected the cell phones of defendant and April. The contents of those phones were later extracted. While investigating April, Lanphear became aware of allegations involving J.C., who was under 18 years old at the time—namely, that J.C. was in a sexual relationship with defendant.

¶ 30 Lamphear stated that those allegations came about as follows: "During a review of [defendant's] cellphone, I located [J.C.'s] phone number saved in his phone. Her contact name in his phone was My Sexy Attractive Future Wifey." Lanphear documented this in a police report and photographed the contact information in defendant's phone. Lanphear stated he "also searched in [defendant's] contacts for April M[.]'s cellphone number, and [he] found that her phone number was saved under the contact name Future Mother-in-law." After receiving this information, Lanphear spoke with defendant at the Super 8 in Bloomington.

¶ 31 Lanphear testified, "Initially, I knocked on the hotel room door and met with [defendant], and then we ended up speaking with [him] down the hallway in a common stairwell that was used to access the different floors of the hotels." Lanphear told defendant that he was free to leave at any time. Defendant said that he was not in a relationship with J.C.; he was simply babysitting the children. He stated that he and J.C. were just really good friends. They were not

going to date until she turned 18. While conducting this interview, J.C. appeared in the hallway, and defendant's behavior changed: "He became visibly much more nervous. He used his hand to cover his mouth and shake his head to try and get [J.C.] to leave the stairwell several times."

¶ 32    Lanphear noted that after J.C. left, "[defendant] became much more relaxed. His hand went away from his face. He stopped shaking his head." Lanphear asked about J.C.'s behavior and defendant told him that "the last time police were around they took her mother and her future man away." Lanphear interpreted the "future man" title to refer to defendant.

¶ 33    During the conversation, defendant admitted that he was in a relationship with J.C. Lanphear stated, "He said that it was [J.C.] who noticed him first, and that it was a huge boost to his ego that a 14-year-old girl was into him." At first, defendant denied that they had a physical relationship, but he later said they held hands. Defendant told Lanphear that their physical relationship had "gotten heavy, but he stopped things." When Lanphear inquired as to what that meant, "[defendant] said things were going hot and high intensity." Defendant also told Lanphear that (1) he and J.C. "stopped before having sex and they were kissing" and (2) "he was touching on her breasts while they were kissing." This touching took place in the pool at the Quality Inn and Suites on East Empire Street.

¶ 34    Lanphear then arranged for J.C. to be interviewed at the CAC. At the time of that interview, April was incarcerated at the McLean County jail. Lanphear learned that while April was in jail, she was contacting both her husband and J.C. Those calls took place before J.C.'s first interview at the CAC.

¶ 35                     3. *Stipulated Evidence*

¶ 36    Defendant later wrote the McLean County State's Attorney's Office a letter denying that he forced J.C. to do anything, and the parties stipulated that the trial court could admit

part of that letter into evidence at trial. It read as follows:

> "The guy you had on the stand on Nov. 2nd John committed perjury: the crime of telling a lie in a court of law[.] Afther [*sic*] promising to tell the truth. He didn't pay for my hotel stay at all[.] I paid for them[.] All 3 hotels it was me plus I didn't force J.C. to do nothing at all exspecialy [*sic*] force her to put my dick in her mouth plus her pussy."

¶ 37                     4. *The Jury's Verdict*

¶ 38        Following deliberations, the jury found defendant guilty of eight counts of aggravated criminal sexual abuse and four counts of criminal sexual assault. These counts can be organized as follows:

> (1) Counts III and IV consisted of criminal sexual assault involving defendant's use of force to place his penis in J.C.'s mouth (720 ILCS 5/11-1.20(a)(1) (West 2022)).
>
> (2) Count V involved criminal sexual assault based upon defendant's use of force to place his mouth on J.C.'s vagina (*id.*).
>
> (3) Counts XI, XII, 1XIII, and XIV consisted of aggravated criminal sexual abuse regarding defendant's performing oral sex on J.C.'s vagina (*id.* § 11-1.60(c)(1)(ii)).
>
> (4) Count VI involved criminal sexual assault based upon defendant's use of force to penetrate J.C.'s vagina with his penis (*id.* § 11-1.20(a)(1)).
>
> (5) Counts VIII and IX consisted of aggravated criminal sexual abuse involving defendant's penetrating J.C.'s vagina with his penis (*id.* § 11-1.60(c)(1)(ii)).
>
> (6) Count VII involved aggravated criminal sexual abuse regarding defendant's act

of placing his hand on J.C.'s breast (*id.*).

(7) Count X consisted of aggravated criminal sexual abuse based upon defendant's penetrating J.C.'s vagina with his penis in July 2022 (*id.*).

¶ 39                                     C. Defendant's Sentence

¶ 40        In January 2025, the trial court conducted a hearing on defendant's posttrial motion and sentencing. The court first addressed defendant's motion for judgment notwithstanding the verdict or a new trial, in which defendant argued that the State failed to prove him guilty beyond a reasonable doubt of four counts of criminal sexual assault and eight counts of aggravated criminal sexual abuse. The court denied his motion and proceeded to sentence defendant.

¶ 41        The trial court asked the parties whether they had come to an agreement about which, if any, accounts merged. The parties stated that they agreed that (1) count IV merged into count III; (2) counts XI, XII, XIII, and XIV, merged into count V; and (3) counts VIII and IX merged into count VI. The court accepted the parties' recommendation and merged those counts. Accordingly, the court sentenced defendant only on count III (criminal sexual assault; defendant's penis in J.C.'s mouth), count V (criminal sexual assault; defendant's mouth on J.C.'s vagina), count VI (criminal sexual assault; defendant's penis in J.C.'s vagina), count VII (aggravated criminal sexual abuse; defendant's hand on J.C.'s breast), and count X (aggravated criminal sexual abuse; defendant's penis in J.C.'s vagina).

¶ 42        Regarding defendant's criminal history, the presentence investigation report provided that defendant had no felony convictions and no convictions since 2003, when he was convicted of driving on suspended license and "leaving the scene."

¶ 43        The State recommended the trial court impose what it argued was the maximum available sentence of 59-years in prison. In aggravation, the State asserted that defendant's conduct

caused or threatened serious harm, specifically, (1) dangerous acts involving force in the hotel pool, (2) using handcuffs, and (3) taking her to the bathroom to receive oral sex. The State also explained that a significant sentence was necessary to deter others from committing similar crimes.

¶ 44		The trial court ultimately sentenced defendant to an aggregate term of 59 years in prison. This sentence consisted of three consecutive 15-year terms for criminal sexual assault (45 years) and two consecutive 7-year terms for criminal sexual abuse, ordered to run consecutively to the sexual assault sentences.

¶ 45		This appeal followed.

¶ 46		II. ANALYSIS

¶ 47		Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he committed two of the counts of criminal sexual assault (720 ILCS 5/11-1.20 (West 2022))—specifically, that he "used or threatened force to put his penis in JC's mouth or to touch her vagina with his mouth." He also argues that (1) his sentence was excessive because the trial court did not apply the rule of lenity to an ambiguous sentencing statute and (2) his sentence was excessive because the court did not properly consider the circumstances of the offense or mitigating evidence.

¶ 48		Because we agree that the evidence was insufficient to sustain two of defendant's convictions for criminal sexual assault, we need not address defendant's other arguments on appeal. Accordingly, we reverse those convictions and remand for a new sentencing hearing.

¶ 49		A. The Applicable Law and Standard of Review

¶ 50		"A person commits criminal sexual assault if that person commits an act of sexual penetration and *** uses force or threat of force." 720 ILCS 5/11-1.20(a) (West 2022). The Criminal Code of 2012 (Code) (*id.* § 5/11-0.1) provides the following definition for " 'Force or

threat of force' ":

> " 'Force or threat of force" means the use of force or violence or the threat of force
> or violence, including, but not limited to, the following situations:
>
>> (1) when the accused threatens to use force or violence on the victim
>> or on any other person, and the victim under the circumstances reasonably
>> believes that the accused has the ability to execute that threat; or
>>
>> (2) when the accused overcomes the victim by use of superior
>> strength or size, physical restraint, or physical confinement."

¶ 51    "Generally speaking, force implies the exertion of power in order to make a victim comply against her will." *People v. Blom*, 2019 IL App (5th) 180260, ¶ 32. "[T]here is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. "When considering the evidence of force, we may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred." *Id.* The victim need not " 'attempt to escape or to cry out where she is restrained by fear or where to do so would endanger her life.' " *Blom*, 2019 IL App (5th) 180260, ¶ 32 (quoting *People v. Gramc*, 181 Ill. App. 3d 729, 735 (1989)).

¶ 52    When reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28.

¶ 53    B. This Case

¶ 54    As an initial matter, we note that defendant does not appear to challenge his

conviction for count VI, which alleged criminal sexual assault involving vaginal intercourse in which he restrained J.C. with handcuffs. J.C. provided explicit testimony regarding the mechanism of restraint, stating, "There was a bar in the hotel room ***. He would proceed to put the handcuffs through there, cuff my wrists above my head and proceeded to put his penis inside of my vagina." Given J.C.'s testimony regarding the handcuffs, the evidence for count VI is sufficient, and we affirm that conviction.

¶ 55　　　　Regarding the remaining counts of criminal sexual assault—namely, counts III and V—defendant contends they lacked the requisite element of force because he did not use or threaten force to coerce J.C. into (1) performing oral sex on him (count III) or (2) allowing him to perform oral sex on her (count V). Defendant argues that the only evidence related to count III was the following exchange:

"Q. Now, did the defendant ever have any specific requests of you?

A. Yes.

Q. Can you tell me what that was?

A. BJs.

Q. Okay. And I have to ask you this. What do you mean by BJs?

A. Blow jobs.

Q. Okay. How would this occur?

A. In the bathroom.

Q. Is this—and this is in his room?

A. Yes.

Q. Okay. And how would this happen?

A. He would have me open my mouth and stuck his penis inside of my

- 13 -

mouth.

Q. How many times did this happen?

A. I don't remember off the top of my head. I lost count.

\* \* \*

Q. Okay. During this—I believe you stated blow jobs—did you ever try to fight him off?

A. No.

Q. Okay. Did you ever tell him no?

A. No."

¶ 56 Regarding count V, defendant argues that the only evidence of sexual penetration between his mouth and J.C.'s vagina was her testimony in the following exchange:

"Q. Now, you talked a lot about acts that were—you had to perform on him. Did he ever do anything to you?

A. (Nodded).

Q. Okay. Can you kind of walk me through that?

A. He would proceed to go down on me.

Q. Okay. And, again, you know, I'm sorry, what do you mean by go down on you?

A. He would put his mouth on my vagina.

Q. Would he restrain you in any ways?

A. No, not when he was doing that."

¶ 57 Defendant points out that nowhere in those exchanges did J.C. testify to the element of force required to sustain a conviction for criminal sexual assault. We agree.

¶ 58 Defendant contends that no evidence showed that J.C. was (1) restrained in any way, (2) scared of defendant, (3) threatened by defendant, (4) resisted defendant, or (5) said "no" to defendant's advances. Defendant acknowledges that J.C. testified that he would say he would kill himself—which the State argued in the trial court constituted the force element for counts III and V—but argues the State misinterpreted that testimony. Defendant emphasizes that the following exchange, during which that testimony was elicited, related only to a marriage proposal and not to any sexual act:

"Q. Okay, thank you. Now, did he ever say anything to you about the future or anything like that?

A. Yes.

Q. What did he say?

A. He would say I would be his wife. He tried to propose to me.

Q. Did you want to marry him?

A. No.

Q. Did you tell him this?

A. No, I didn't.

Q. How would he react after these proposals?

A. If I say no, he would say he would kill himself."

¶ 59 The State responds that J.C.'s testimony regarding defendant's threats to kill himself if she rejected his marriage proposals constituted a "threat of force" under section 11-1.20(a)(1) of the Code (720 ILCS 5/11-1.20(a)(1) (West 2022)) and a jury could reasonably infer that defendant's threats to kill himself if J.C. said "no" to marriage predominated throughout the instances of sexual assault. Accordingly, the State argues that viewing the evidence in the light

most favorable to the prosecution, the element of force for counts III and V was met by the inference that J.C. was compelled to participate in sexual acts with defendant because of the knowledge that he would threaten to kill himself if she said "no" to a marriage proposal. We disagree with the State.

¶ 60 When determining whether a defendant used force or the threat of force when committing an act of sexual penetration, we may take into consideration the surrounding circumstances and conditions in which the incident occurred. See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38). "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** *uses* force or threat of force." (Emphasis added.) 720 ILCS 5/11-1.20(a) (West 2022). In other words, "force implies the exertion of power in order to make a victim comply against her will." *Blom*, 2019 IL App (5th) 180260, ¶ 32.

¶ 61 Here, no evidence connects defendant's threat of self-harm to any incident of penetration or use of that threat to have J.C. comply with his advances. The only case the State discusses regarding this issue is *People v. Watts*, 2022 IL App (4th) 210590, which the State cites to argue that threats of self-harm can meet the force element for section 11-1.20(a)(1) of the Code. However, *Watts* provides no authority for (1) the specific evidentiary issue of how defendant's threats here connected to the sexual acts in counts III and V or (2) the State's contention that threats of self-harm may be sufficient to meet the element of force for criminal sexual assault. Indeed, in *Watts*, the only issue regarding the defendant's statements of self-harm was whether such statements were admissible for a nonpropensity purpose—specifically, as a continuing course of conduct or evidence of intent and motive. *Id.* ¶ 62. Further, we noted in that case that even if the trial court erroneously admitted those statements, it was not a material factor in the conviction for criminal sexual assault. *Id.* ¶ 68. Evidence that is immaterial to a conviction is a far cry from a

statement by this court that such evidence is sufficient to meet the use of force element of criminal sexual assault.

¶ 62       Nonetheless, in the present case, even assuming that a threat of self-harm was sufficient to constitute force under the Code—a proposition we seriously doubt—we conclude, based on J.C.'s testimony, that the evidence in this case does not even link those threats to the sexual acts defendant committed with J.C. Accordingly, the State failed to prove the element of use of force beyond a reasonable doubt regarding criminal sexual assault as charged in counts III and V. As a result, we reverse those convictions and remand this case for a new sentencing hearing.

¶ 63       To summarize our decision for the benefit of the trial court and the parties, we affirm defendant's convictions and sentences on counts VI, VII, and X, but we reverse his convictions on counts III and V. Because the trial court previously ordered counts XI, XII, XIII, and XIV merged into count V, we remand the case with directions for the trial court to conduct a sentencing hearing on counts XI, XII, XIII, and XIV. We note that the trial court ordered count III merged with count IV, and both counts alleged criminal sexual assault requiring proof of force or the threat of force. Count IV fails for the reason we reversed defendant's conviction on count III.

¶ 64       Accordingly, the only counts remaining for sentencing on remand are counts XI, XII, XIII, and XIV.

¶ 65                         III. CONCLUSION

¶ 66       For the reasons stated, we affirm the trial court's judgment in part, reverse in part, and remand with directions. Specifically, we affirm defendant's convictions and sentences on counts VI, VII, and X. We reverse defendant's convictions on counts III and V. Finally, we remand the case to the trial court for the limited purpose of conducting a sentencing hearing on counts XI, XII, XIII, and XIV.

¶ 67        Affirmed in part and reversed in part; cause remanded with directions.